Radcliff, J.
Notwithstanding the able discussion this case has received, I, cannot perceive any grounds on which to change the opinion that I entertained at the trial. Yt is expressly stated, that the injuries received by the ship, might have been repaired at Martinique, for less than half her value. The- plaintiffs, therefore, cannot recover for a total loss, on the principle that a moiety of the value of the ship was lost.. Their claim for a total loss must depend on the question, whether the defendant, being an ■ underwriter on the ship, shall be affected by the loss of the cargo, occasioned by the necessity of sale, in consequence of the perishable *356 nature of the articles, and not- in consequence of an actual-injury sustained, by means of any of the perils' insured against.
In general, it is ■ true, that the subjects of insurance are intimately connected, and the perils attending the one most commonly affect the other. The sources of danger are, in most instances, the same, and the policies' on each indiscriminately insure agárnst. .' the same, risks.. But [*295] although *the same dangers await them, they are considered as distinct and independent of each other, and liable to different ,"results. The same cause, or occasion of loss-may affect them in different degrees,- and entitle the insured on each to a different measure of compensation, as sometimes to recover on the one for a total, and on the other, for a partial loss .only. Thus the ship, in a technical sense, may be totally lost, and’the freight pro rata, for the greater part of the voyage- be saved. So :the ship, or both the ship and her freight may be lost, and the cargo saved, by being conveyed without delay, in another ship, to the port of destination. This,was the case in Plantamour Staples, (T. R. 611, n. a,) in. which the insured on the cargo, recovered for an average loss only. In like manner, the freight and cargo, or either, may be wholly lost, and the ship, saved, as in case of a capture, and a detention of the cargo, and the immediate release of the ship before an abandonment. ) . ' . ' "
These instances show, that'although liable to.the same perils, the consequences to each subject of insurance, maybe essentially different. , It is, therefore, .necessary in every case. of a loss,-in order to determine the insurer’sResponsibility, to inquire to what extent the subject insured -is affected. He is liable for that, and no. more. According to-the terms of the contract,- his responsibility can extend no farther. It was never imagined that an insurer upon either ship, freight, or cargo, could be held liable for a loss sustained by the siibjects which he did not insure, and if not directly liable, I think he cannot be, indirectly affected by any accident th at attends them.- If the subject insured be a ship, he undertakes, that *357 she shall be in a condition to perform the voyage, or in the words of Mr. Justice Buller, he insures the ship for the voyage. If the ship be disabled, he is liable, according to the circumstances, for a total or a partial loss, but he is liable in relation to the ship only, and he cannot be affected by the state of the cargo which he did not insure. On these principles, I'am of opinion, that the plaintiffs in this action are not entitled to recover *for a total loss. The [*296] ship was capable of being repaired at a reasonable expense, and within a reasonable time, and, therefore, in a capacity to perform the voyage.
Although the object of the voyage was defeated, it was not on account of the accidents which attended the ship, and, therefore, not by any peril assumed by the defendant. The rule that when a voyage is defeated, the insured may abandon and recover for a total loss is a sound one, when applied to the subject insured. The cases which have been cited, I think extend no farther. - .
In Hamilton v. Mendez, (2 Burr. 1198,) in which this rule was adopted, the insurance was on ship and cargo, and. Lord Mansfield, in delivering the opinion of the court, speaks indiscriminately of both ; it was unnecessary in that case, to distinguish between them, for the loss was the result of a capture and recapture, and the circumstances relative to the ship and cargo were in all respects the same.
In the case of Goss v. Withers, (2 Burr. 683,) there were two distinct policies on ship and cargo, and the injuries to each were distinctly considered.
The case of Cazelet v. Barbe, (1 T. R. 187,) also appears to have been governed by the'same distinction. That was an insurance on the ship only, and the question was, whether the insured could recover for a total or a partial loss. The principles on which that case was considered, and the determination of the court related wholly to the loss sustained by the ship, without the least reference to the cargo. None of the other cases that have been mentioned, contradict this rule, and although the question does not appear to have been di *358 rectly decided, I think the reason and justice of the case are decisively in favor of the defendant.
But in the present instance, it has been contended that the underwriter on the ship shall be affected not only by an injury to the cargo, occasioned by the accidents which attended-the ship, but shall also be answerable for the loss of the voyage resulting from the perishable nature of the goods [*297] which remained unhurt. If his responsibility can *be carried to this extent, it appears to me that a new course of proceeding ought to be adopted in the practice of insuring. If the underwriter on the ship can be affected by the nature of the cargo, he ought to be informed with respect to its quality, and it ought to be required of the insured, in every instance, to disclose to him the particular commodities to be laden on board the ship to be insured. It would certainly be material to the risk, and affect the amount of the premium, and without such disclosure the policy ought to be discharged. So in the case of articles commonly treated as perishable, it would be necessary that the underwriter on the ship should protect himself from the losses usually provided against, by the memorandum at the foot of cargo policies ; otherwisé, if a cargo of such articles, by a trifling accident to the ship, should happen to perish, the insurer on the ship, being affected by the state of the cargo, would be liable for a total loss, and at the same time, the insurer upon the cargo itself, might not be liable at all. Yet a memorandum of this kind to a policy on the ship alone, I believe was never known. Other difficulties of a similar nature may be easily conceived, and-the extent of them cannot be foreseen.' They seem to show that the doctrine- contended for, and the consequences which would flow from it, were never contemplated by the parties to an insurance. As far as I can trace those consequences, they present insuperable obstacles in almost every situation of the parties, and I can adopt no rule more simple in itself, and which appears to me more agreeable to the intent and just construction of the contract, than to consider the losses attending the different subjects of in *359 surance, as distinct and independent of each other, as the policies themselves are distinct.
I am, therefore, of opinion- in the • present case, that the ship being in a condition tojoe repaired, and in a capacity to-perform the voyage, the plaintiffs are not entitled to recover for a total, but for a partial loss only, and that a new trial ought, therefore, to be awarded.
*Lewis, J. Three principal questions arise in [*298] this cause.
1. Whether the ship was seaworthy.
2. Whether she was disabled from pursuing her voyage, through -stress of weather.
3. Whether the sale of the perishable articles at Martinique, which composed nearly two-thirds in value of her cargo, was a consequence of the injury sustained in the storm, and a sufficient motive for abandoning the. voyage.
The first question affects the right of recovery generally. The two others relate to the amount of damages.
The first, though depending on professional skill, and opinion, is nevertheless a simple question of fact, on which the jury alone were competent to decide: and as there appears to have been considerable testimony on both sides, which they must have had under their consideration, and upon which they must have made up an opinion, I consider the court as precluded from saying that they ought to have decided differently from what they have done on this point.
The second question appears to be in the same situation. Burnet, the master ship-wright of the dock-yard at Port Royal, testifies that the ship was not in a state to proceed to the East Indies, and that the repairs necessary- for such a voyage could not have been effected at Martinique. Paltneter, another ship-wright at the same place, testifies, that the expense of her repairs at Martinique would have exceeded her value. If this be true, then the verdict for a total loss is right; because her whole value would have been sunk to the owner. It is true, that the report of survey states that she might have been repaired for 1200Z. sterling; but it does not state that she might have been thus repaired for an East *360 India voyage. ‘ On the contrary, it could not have been made with a view to such a voyage, as the master had determined to sell the cargo, and return to New York, previous [*299] to the survey; and, as one of the *witnesses deposes, she could not be repaired in Martinique for- such a voyage.
The captain, on the other hand, deposes, that he thought the ship strong enough, after she was refitted, to proceed on a voyage to India, though he would not like to have gone in her, without new sheathing her larboard like her starboard side, which might have been done for about 3000 dollars. It may be said, that had not the captain sold the principal part of his cargo at Martinique, there is a probability that under the influence of his own opinion of the strength' of the ship, he would have prosecuted his voyage. But it is equally probable, that as a prudent man, he would have -reposed himself on the opinion of the ship-wrights and merchants ; for, had he proceeded, and the ship been lost from an inability to resist the ordinary perils ■ of the ocean, there would have been room for dissatisfaction, on the part of the underwriters, and in the event of a recovery, their loss would have been enhanced. Besides, the advanced state of the season might have been a sufficient reason for not prosecuting the voyage. It appears from the letters of instruction from the agents of Mr. Dickson, the plaintiffs in this cause, that it was late when he sailed; upwards of two months were occupied by the repairs she received, and a further repair would have occasioned a much longer delay. Thus it appears, that there has been testimony on both sides of this question also, and as it was a mere matter of fact, it belonged entirely to the jury to decide upon it.
The verdict for a total loss may, however have been founded on the facts stated in the third question; an examination of it, therefore, also becomes necessary. It was observed by one of the plaintiffs’ counsel, that the verdict being general, and it not appearing on what particular ground it is founded, if there is a sufficient one, it ought to be supported. I believe this a good general rule, and if the second question *361 Stated, was perfectly free from doubt, I should have tio hesitation, as to its *applicability to the present [*300] ease. But this is not precisely the fact.
It was contended, on the part of the defendant, that the ship, cargo, and freight, being distinct subjects of insurance, are so disconnected, that the loss or injury of the one cannot affect the policies on the others. The subject of this proposition is certainly true; but the predicate is as certainly the reverse. There are cases in which they may be connected and influence each other; there are others in which it is imposible to disconnect them. Thus, between the goods and freight, a total loss of the former annihilates the latter. A jettison of the former creates a general average on the whole. As between' the ship and freight, the former being arrested in her iter, the latter is demandable pro rata only. The connection material to the decision of this ques* tion, is that between the goods and the ship.
It was asserted by one of the counsel for the defendant, that no ease is to be found in which the loss of the cargo has affected the policy on the ship. This, I think, is a mistake. According to my understanding of the cases of Goss v. Withers, and Milles v. Fletcher, the doctrine is expressly recognized in each of them.
In the former case, although there were two actions on two policies, one on the ship, the other on the cargo; the two questions submitted to the consideration of the court, arose upon the former. The second question was exclusively so, because it related solely to the right of abandoning the ship. The Whole argument of Lord Mansfield rests upon this policy, with the exception of an incidental observation, that every thing advanced on it, held stronger in the case of the other policy with regard to the good's. It is in relation to the former policy, that the following arguments are made use of “ The freight (except in proportion to the goods saved) was lost.” “ To pursue the voyage was not worth the freight.’’ “ The goods saved might not be worth the freight. for so much of the voyage as they had gone, when they Were taken.” “ The cargo ‘"from its nature, must [*301] *362 have been sold where it was brought in.” These circumstances, though having an immediate relation to the goods and freight, are held so to affect the ship also, as to constitute a right to abandon her. If we are not to understand them in this sense, what explanation shall we give of a loss of voyage constituting a right to abandon the ship ? If she does not arrive with her cargo, at her port of discharge, she sustains a diminution at least of her freight, which is her earnings. If the goods saved are insufficient to pay her freight pro rata itineris, her .security for it is lessened in proportion to the diminution of the subject of her lien.
In the case of Milles v. Fletcher, which was an insurance on the ship and freight, the arguments of the court turn principally on the situation of the cargo ; and as they are offered conjunctively with relation to both subjects of insurance, I can see no authority by which we ought to consider them distributively. One of them is expressly applied to the ship, in the following terms: “ As to the ship, it was certainly better to sell her than to bring her to London.” Why 1 One reason is, because, “ she had no cargo,”
I haye viewed this subject in every situation in which I am capable of placing it, and can imagine but one case in ivhich the loss of cargo does not affect the ship ; and that is, where the goods arrive, specifically at the port of discharge, though injured or even destroyed ; and that is on the principle, that neither the ship nor the voyage is lost, She sustains no injury, either immediate or by direct consequence, except in the diminution of her security for her freight, which is but a remote contingency, as a cause of real loss, and, therefore, insufficient, perhaps, per se to warrant an abandonment.
The only remaining question is, whether the sale of the supposed perishable part of the cargo, was a sufficient reason for abandoning the voyage ? Or rather, whether the loss of the voyage was a consequence of a peril incurred within the policy ? It was insisted, on the part of the defendant, on the authority of Jones v. Schmoll, (1 Term Rep. [*302] . 130, n.) that it *must be a. direct and immediate *363 consequence of the peril insured against, and not a remote one.
Iti Robertson v. Ewer, (1 Term Rep. 127,) the case is so cited by Mr. Erskine, and Mr. Parke has adopted his precise words; but in a report of it, in a note to the case last mentioned, Lord Mansfield is not made to speak in such strong terms. He. only says, that the underwriter is not answerable for the loss or price of market, as this is a remote consequence, and not within any peril insured against. It is true, that he leaves it as a question for the jury to determine what slaves fell within the terms of the policy, it being an insurance against mutiny, and what did not. I do not consider this case as of much authority. It was at nisi prius, and, in my opinion, contains absurdities. Thus the distinction taken by his lordship between the effect of mutiny, and that of the failure of mutiny, as if the favorable or unfavorable issue of the thing could alter its nature: Thus, also, the distinction taken between the slaves who, to avoid the fire of the crew, precipitated themselves down the gangway, and thus terminated their existence, or those who, from the same motives, threw themselves into the ocean, and there met a similar fate; and that the underwriters should be held liable for the former and not the latter, are to me things unintelligible. I should suppose a better rule to be, that where the loss of voyage was a necessary or justifiable consequence of the peril incurred, the underwriter should be liable, otherwise not. I will apply this rule to the present case. The Captain had an implied authority from all the parties concerned, to do what was fit and right, and for the general benefit; and each must abide by the consequences. On his arrival at Martinique, he found no agent to whom he could apply for instructions. He did what he, in prudence, ought to dohe applied for advice from merchants on the spot. He was compelled to unload his cargo, and to repair his ship. He was compelled to lay it on the hot beach, and was advised that the wine and porter, thus exposed, would not bear the influence of a tropical sun; *and that, there- [*303] fore, he ought, in prudence, to dispose of it. He fol *364 lowed their advice, and is thereby" deprived of the principal part" of his cargo. The season,- too, from the length of time he had been delayed* was probably lost. The object of the voyage was also defeated. For, to carry money, to India* instead of the articles originally shipped* might not be equally beneficial. The greater part of the freight must be lost. Besides, he. might be apprised of the abandonment of -the cargo, and then surely he would not be justified in carrying the money,.which belonged to the underwriters, to India* without their consent. - Most of these points will be found to "have-entered deeply into the decision of the court in Milles. v. Fletcher. Whether, then,-from a view of these" circumstances, the loss of the voyage was,'if I may so express myself, a prudential necessity, consequent to the injury sustained by the seas, was a proper subject of inquiry for th'e jury. It has been .submitted to "them; they have decidéd it; and I cannot say that there is such manifest error in their decision, as would warrant; my. assenting to set it aside.
My opinion* therefore,, -is, that the defendant ought, to take nothing by his motion.
Benson, J. was also of opinion, that the voyage was ‘defeat- ... ed, and that the plaintiffs were, therefore* entitled to recover as for a total loss.
Lansing,. Ch. J. A motion has been made to set aside the verdict in this cause, on- two grounds.
1. - Because it was contrary to evidence, as to the seaworthiness of the ship. ■ .
2. Because the plaintiffs were not entitled to recover as for a total loss.
The- doctrine of seaworthiness imposes on the insured, a knowledge of. the condition of the ship, so far as to exempt-the insurer from responsibility from any loss arising from its deficiency or defective quality.
If any latent defect,occasioned the'loss of-the ship, it -is one Of those perils against which the insurer has not stipulated to " indemnify the insured. -
[*304] ■ ,*The question, then, is, whether the weight of testimony is such, that the impediment of the voyage,." *365 in this instance, was owing to such latent defect, so as to induce the court to say that the verdict is against evidence-
From the testimony of Captain Dodge, it appears that he examined the ship minutely, by boring her timbers, about eighteen months before the commencement of her voyage, and that she was then perfectly sound.
Thorn, a ship-carpenter, employed in caulking the ship before her departure from New York, and after her return to that port, in examining her, pronounced her perfectly sound, and a remaikably strong built ship; and from both examinations, he concludes she was seaworthy when she sailed. He afterwards assisted Rutgers and Miller, the wardens of the port, in examining the ship, about two years after she returned. They all agreed that she was a remarkably strong and good ship.
William Burns, William Bennett, and George Parmeter, who surveyed the ship at Martinique, describe the defects they discovered on such survey generally ; that about a dozen of the lodging and dagger knees were rotten and decayed, and two or three of her beams defective ; that the main-mast was sprung, and part of the copper sheathing off. Bennet adds, that one of her beams was broke, and they all are oí opinion, that the ship could not have been seaworthy when she left New York.
Richard Packwood, the ship-wright who repaired the ship, testifies, that about nine of the dagger knees were broken and rotten; that one of her lower deck beams was rotten at the end ; that one carline and sleeper had fallen from the deck j that the copper had eaten the iron bolts : and that the starboard side sheathing and copper were washed away.
William Dodge, the captain, in his deposition, enters into a fuller explanation of the nature of the defects. He describes the knees as a little defective at the ends, but some were broken that were not defective; that the new "oak knees were not quite as good as the old ones; [.*305] that it did not appear that the copper had corroded the nails, or the iron rotted the plank; and he supposed the ship sufficiently strong, after being refitted, to proceed to India;
*366 William Smith, the mate, testified that he examined the ship before she left New York; that she appeared to him to be tight, staunch and strong.; that one of the1 beams, which was afterwards found to be defective, was somewhat'rotten at one end, but was broke in a sound part of it.; that, the knees were remarkably well bolted, having each three or four bolts iii’ the sound parts of them, only five were a little rotted at the ends, and that he believes the ship Was seaworthy when she left New York, and capable of proceeding to the East Indies, if she had not met with the violent gale in which she was injured; and that .the sheathing, he thinks, was good before .the storm, but some of the nails appeared corroded. ,
There is no doubt that the vessel was exposed for many hours to a violent storm.
There are other’witnesses, whose testimony tends to. support the different sides of these irreconcileable opinions,,but .enough is detailed to show that there was great room for the jury to exercise their judgment in their peculiar province, to discover which ought to preponderate ; that there was evidence on both sides, and that the preponderantly is. not so great on either, as to induce the court to pronounce that this is a verdict contrary to evidence, or even the weight of evidence.
This point was particularly stated, as an object of attention to the jury, and as they have passed upon it,. I think, if this was the only question, it ought to conclude the parties;
The second ground is, that the plaintiffs were not entitled to recover for a total loss.
I understand the insurance, as it was stated in the argument, to be an insurance on the ship, for the voyage; that if the ship was so injured as to detract more than [*306] one *half from its valué, or the voyage had been.so far defeated as to "render it an object not worth pursuing, the insured might, by abandoning, have constituted it a total loss. (Park. 164.)
The ship appears" to have been valued at 25,000 dollars. The amount of the repairs, was 4199 dollars •;. and if the sheathing which remained on her ■ had been taken off, it *367 appears that the whole would, not have exceeded 7199 dollars.
The ship, therefore, unconnected with the circumstance in which the cargo was placed, was not so much injured" as to constitute a casé authorizing an abandonment. The actual expenditures were less than one-fifth of her estimated value, and adding the repairs which were supposed necessary, but which in the result appeared not to have been so, they would not have amounted to one-third.
The time necessarily employed in refitting the ship, does not appear. She arrived at Martinique, on the 3d of March, and William Parsons declares that she left it about the month of June; but whether all the intermediate time was necessarily spent in repairing, or what influence her detention could have had on her voyage, is totally left out of the case.
The point, that the ship was not capable of proceeding to India after she was repaired, appears not to have been much insisted on in the argument; but it was said, that the articles, the proceeds of which were to furnish freight upon her return, were parted with, from an apprehension that they would be spoiled by their exposure to the heat of the sun on the beach.
The insurance in this instance is not on the cargo, but on the ship ; and, as in cases of insurance of goods, the speculation of the merchant is not attended to, so in this case, in my opinion, the profit of the voyage is not in question, as connected with its ulterior object, the safe progress of the ship to the port ¡of its destination. The inquiry resolves itself into the simple question, whether she was capable of earning freight generally, and "not *whether [*307] she carried the particular cargo with which she-was laden, in safety.
To exemplify this doctrine, I will state a case :
Suppose the ship had sprung a leak, the day after she left New York, which, though it spoiled her cargo to all useful purposes, might have been repaired at a trifling expense, and without loss of time. Here the leak not detracting from the ship one-half its value, nor destroying its capacity to earn *368 freight,"could not authorize the abandonment of the ship, and yet the funds destined to produce the freight would be completely destroyed.
A contrary doctrine would make the insurer responsible not only for .the safety of the ship, but the preservation of the cargo.
If, however, the intimate connection, which is contended, on the part of the plaintiffs, to subsist between the ship and cargo, actually existed, it could not better their situation, for the sale of the cargo was merely dictated by an apprehension of loss, and the, captain declares, that before he-had taken measures to ascertain the extent of the injury the ship had received, he had resolved to convert the claret and porter into cash, by the advice of his friends, and under the influence of this apprehension.
It was a matter of no consequence to the insurer, if the claret and porter were preserved in substance, that their inherent tendency to spoil had rendered them of no 'value. Perils of the sea were only insured against, and if they were not injured by some of these, whether the claret and porter commanded, at the port of delivery, or at any intermediate port, prices equal to those of the best quality of such articles, or a sum not m ore than the value oí the casks in which they were contained, was immaterial to the insurer. He had only stipulated that the ship should, notwithstanding the perils insured against, be in a capacity to earn a reasonable freight for-the voyage, and not that the goods should remain in perfect preservation.
[*308] *There is no point of view in which I have been able to place this subject, which would, in my opinion, justify a verdict as for a total loss. I am, therefore, for setting aside the verdict on this ground.
Another ground was mentioned in the argument; that the jury had sealed their verdict, and separated before it Was delivered to a judge, or given in court. This practice has been for some time established, for the sake of convenience. The delivery to the judge does not afford the parties any addi *369 tional security; for after it has been sealed, -they may take it into court.
I am inclined to consider the objection as of no weight, but it is not necessary for me to give any opinion on the point, as the second reason for a new trial is, in my opinion, decisive.
Kent, J.
Having formerly been concerned as counsel in the cause, it was not my intention to have expressed any opinion on .the questions which have been argued ; but as the other judges are equally divided in their opinions, I think it proper, in order that there may be a new trial on the merits, and that the parties may have an opportunity, by a bill of exceptions, or a special verdict, to spread the case on the record, and carry it up by a writ of error, to be decided in the court of the last resort, briefly to state my opinion on the case.
The question of seaworthiness was fairly submitted to the jury, and t.wo verdicts having already been given on that point, and there being a variety of testimony, and some of it contradictory,; I think the verdict ought not to be disturbed on that ground.
But the weight of evidence is, that the ship was not so injured as to be worth less than half of her value. It appears that she might have been repaired.for one-fifth of her value, and that she was actually repaired and returned from Martinique to New York. The sale of the liquor, admitting the sale to have been a direct and necessary consequence of "one of the perils in the policy, ought not to be considered as defeating the voyage. The /liquors constituted [*309] only a small freight, for a ship of 400 tons, and a principal object of the voyage must have been the home^ ward freight from the East Indies.
Here then did not exist a case authorizing an abandonment. Neither the subject insured, nor the voyage was lost. And indeed,. I think it is a question (though not necessary now to be discussed and decided,) whether oír a policy on a ship, the insured can abandon while the ship is safe, in consequence of the loss of cargo, and whether the true rule *370 of law-be-not; that the subject insured must be either actually lost or so injured, as thereby to occasion a loss of the voyage, -before it can be abandoned.. (See Pole v. Fitzgerald, Willes’ Rep. 647.) But as I observed¡ it is not necessary, and therefore, I give no opinion on this point, It is sufficient to say,- that here does not appear to exist a case constituting a total loss* and that the plaintiff is entitled only to an average loss.
It may-further be observed, as á strong auxiliary consideration in favor of granting a new trial, that the. thing in controversy is of great value, and the testimony considerably nice and complex.-
I am accordingly of opinion, that the verdict should be set aside, and a new trial granted, an the payment of cost's".
Rule granted accordingly.(a)

 The cause was again brought to trial,, when a special verdict was found,, containing, in substance, the facts as above stated. A judgment was given for the .plaintiffs in this court, for a. partial loss, upon which a writ of error was brought, and, after argument, the court of errors, in February-, 1801, affirmed the judgment of this-court as above delivered by Lansing, Ch. J. Radcliff., J. and Kent, J.