*Tiluhman C. J.
The only question in this case seems to be, whether the plaintiff had a right to abandon. If he had not, the vei’dict is wrong, for the jury haye given damages for a total loss. The ship reached her port of destination, having suffered damage by running on a sand bank. The captain thinks, that she could not have been repaired at Antwerp. But that is not material. The insurance ended at that port. All that can be demanded of the underwriters is to make good the damage sustained during the voyage. If that damage amounts to 50 per cent, the insured may abandon. A ship may have sustained damage to *363 less than 50 per cent, and yet may not be worth repairing, because she may have been worth very little before she received the injury. In Cazalet and others v. St. Barbe, 1 D. & E. 187, the ship reached her port of discharge, where she was not worth repairing; yet as the jury found that the damage sustained in the voyage, amounted to only forty-eight per cent, the plaintiff’, could not recover for a total loss. Hence it appears that the assured has not a right to abandon merely because the ship cannot be repaired after the voyage is ended. It is not so easy to fix the proportion of damage suffered by a ship as it is of goods; especially if part of the goods should be damaged and part sound. By comparing the price of the sound with that of the damaged at the place where they are sold, we have the exact proportion of damage. But in case of a ship, we have no second object with which we can make a comparison. Besides, it is impossible to know the extent of damage in a ship, unless you are at a port where she may be thoroughly examined. Of this we have a striking instance in the case before us. For want of a proper search, it was supposed that the keel was broken. This was an essential error. If the keel had in fact been broken, the ship would have been of little value; but if unbroken her value was considerable. It was impossible therefore to decide at Antwerp, to what amount damage had been sustained. But afterwards it was ascertained with accuracy at London. Now it is very clear that the underwriters are answerable for the real and not for the imaginary damage. Keeping this principle in view, the question under consideration, will not be of difficult solution. It has been perplexed by making an estimate at Antwerp under false '-impressions. Captain Wickes supposed that the keel was broken, and therefore determined not to bid more than 18,000 francs. Those who attended the sale were of the same opinion, and therefore the ship went off at about 13,100 francs. But when the actual damage.was ascertained at London, the captain knew at once that she was a valuable ship. But to what «amount had she been damaged during the voyage? Was it under or over 50 per cent.? If we compare the damaged parts with those which were sound, the amount appears far less than 50 per cent. But that may be said to be an unfair estimate, because the injury was of such a nature as not to be reparable, without ripping off the old copper sheathing, and when ripped off it was more economical to sheath her with new copper than to put the old on again. Suppose it to be so, how will the case stand ? The total repairs including a new copper sheathing amounted to *364 about 5800 dollars. But we cannot suppose, that after those repairs the ship was worth less than fifteen or sixteen thousand dollars, and probably more. Of this there is good proof, because long after the repairs, having gone from London to the United States, and from thence to Bengal and Holland, she was sold for 12,000 dolls. Now if we add to the repairs at London, the reasonable expenses of carrying the ship from Antwerp to London, the amount will still be under 50 per cent. I say nothing of the sale of the ship at Antwerp, where she was purchased for the use of the owners, because under all circumstances, it appears to have been but nominal. No stress was laid on it in the argument, nor was it worthy of any. The verdict was contrary to the inclination of Judge Teates, and as the case strikes me much in the same light that it did him, I am of opinion that there should be a new trial.
Abates J.
The present motion for a new trial rests on two grounds.
1. That no sufficient ground of abandonment was exhibited to the defendants.
2. That the vessel insured was not deteriorated one half of her value by striking on the sand bank in the course of her voyage.
1. The plaintiff owned three fourths of the ship Benjamin Eranklin, and abandoned his interest in consequence of a recetyed from Davy and Roberts dated London 8th July 1805, referring to letters which they had received from the supercargo and consignees, and the condemnation of the ship in the commercial tribunal of Antwerp, and the sale made in pursuance thereof.
I told the jury on the trial, that the manner of penning the letter of abandonment was very questionable; but we are warranted to infer from the tenor of that letter, that the different papers were exhibited therewith to the company. If those documents contained a valid cause of abandonment, though the same was not formally expressed, I think it would be sufficient under the liberality of modern decisions, if every thing else was right; indeed this point was not much pressed on the argument. This brings me to the second ground, which is a question of fact, as to the extent of the injury received by the ship, arising from one of the perils specified in the policy.
2. There is no contrariety whatever in the evidence either written or parol. It is a case fully open to the exercise of the controlling power of the court. There is a strong feature *365 in it, that the vessel insured arrived at her port of destination with her cargo in perfect safety, and earned her freight.
It appeared in evidence, that the ship was newly coppered in Hamburgh in November 1799, which would last from five to seven years. She afterwards performed two voyages, one to Havre de Grace, and one to Bourdeaux, before the subscription of the present policy on the 21st June 1804. S.he sailed from Philadelphia on the 4th of that month, arrived at Batavia and afterwards at Cowes, from whence on the 12th April 1805 she proceeded on her destined voyage to Antwerp, having taken on board an English pilot at Hover. In four days afterwards, she struck on a sand bank at high water, in full sail, and continued beating thereon for three nights and two days, making much water. She was then lightened by the discharge of nearly half her cargo, and hove off with anchors. She arrived at Flushing and thence proceeded to Antwerp, where she arrived on the 12th May. In pursuance of an order of the commercial tribunal of Antwerp, the damage she had sustained was estimated by surveyors at 9910 francs, excluding the expense of new coppering her, and she was valued at 24,000 francs. Her ’■captain entertained a strong opinion that her keel was broken, but in this particular he was mistaken. Her masts, sails, rigging, anchors, and boats had received no injury. Upon being bought in for her owners, the captain sailed in her without further repairs to London, where she arrived safely, and was laid up in a dry dock. Upon a full examination, it was discovered that her kelson had been broken in two places, and that eleven of her lower futtock timbers had also been broken on her larboard side, but her keel was found perfectly sound, and her starboard side entire, and all the defects in her bottom did not exceed two square feet. A small párt of the coppering on the larboard side appeared to have been worn, probably from her motion on the sand bank. The repairs made on her in the dry dock amounted to 12952.18s. 8a. sterling, including a new complete copper sheathing ; but excluding the same, the repairs properly chargeable to the underwriter, did not exceed 35 02. sterling. After being fully repaired in the dry dock, she took in a freight for this port, arrived here, and without any further repairs performed a voyage to Bengal and Holland, and was afterwards sold for 12,000 dollars.
Insurance is a contract of indemnity founded on principles of the purest good faith. The damage accruing to a ship insured, by ordinary wear and tear during the course of her voyage, must necessarily be borne by the owners. If *366 she receives an injury from one of the perils in the policy, after the risk has begun, which does not frustrate the voyage, she should be put into the same physical state as she was at and immediately before the accident, at the expense of the insurers; but they are not bound after the voyage is terminated, to refit her for long voyages by complete repairs. The measure of compensation is to be proportioned to the injury. I cannot conceive, that if a slight injury happened in a small part of the coppering on one side of this ship by her beating on the sand bank, that the underwriters were obliged to give ber an entire new copper sheathing. The copper had been on her bottom nearly five and a half years, and the voyage insured had been safely performed.
I do not see any mode of calculation by which the damage received by the ship Benjamin Franklin on the sand bank can be swelled to one moiety of her value. If we take the *estimate of the surveyors at Antwerp, it will not produce that result. If we take the amount of repairs made in the dry dock in London, properly chargeable to the underwriters, it will not be produced. After performing another voyage to Bengal and Holland, having previously returned to this port, she was sold for 12,000 dollars. Should we oppose the unsound to the sound parts of the hull, or estimate the expense of repairing her broken kelson, and eleven broken futtock timbers, added to the expense of putting her in a dry dock to reduce her to her former shape, we cannot doubt as to her comparative value while she lay at Antwerp. "Whether we make her valuation at that port by the surveyors, or in the policy by her owners and deduct therefrom the ordinary wear and tear, the standard of decision, I cannot bring myself to believe, that she was deteriorated one half by the effect of her running on the sand bank. I am therefore constrained to say, that the verdict is not supported by the evidence, and that a new trial should be awarded.
Brackenridge J.
The first question which I shall make in this case will be, has there been at any time a cause of abandonment ? This will depend upon 50 per cent, deterioration, which the jury by their verdict impliedly have found. The survey and condemnation are prima facie evidence of a want of seaworthiness, and nothing more. But the deterioration of 50 per cent, must have been collected from the evidence. This required calculation in some particulars, estimation in others. The jury may, from oversight, have omitted taking some things into the account, as *367 the value of the old copper stripped from the vessel; but unless I were to go minutely into the investigation of this matter of fact, I could not certainly say that it has been the case, though it would seem, from looking at it in gross, very probable. But a court, on a motion for a new trial, cannot delay business by going into a minute examination of items and estimates; nor perhaps are they equally competent with a jury to do this, with some of whom of mercantile character these matters are more familiar, at least as to what may depend upon casting up accounts. I shall not therefore interfere with the verdict on the ground of value, but take it that there had *been a deterioration of 50 per cent., and a cause of abandonment.
The second question will be, had this cause ceased to exist at the time of the abandonment ? The ship had been before this time repaired; and the state of the fact at the time of the abandonment, is to govern. But is a repaired- ship the same ship that she was before repair? In the case of restoration after capture, or of recapture after capture, it is the same ship that is restored. But the repair of parts in such a case as this, where the constitution of the whole vessel must have been weakened, the repair of parts cannot restore the constitution that has been weakened by shocks that go to the system, and which nothing but building anew could amend. And how could this weakening be distinguished from the particular injury, so as to deduct it from the whole in pursuing for a partial loss ? I think therefore that the repairing did not take away the cause of abandonment that did exist.
The third question will be as to the form of the abandonment. It does not receive a good cause of abandonment; the survey and condemnation is not a good cause. That I admit; it is but prima facie evidence of that want of seaworthiness to which it refers. But I do not take it to be necessary to recite the cause of the abandonment in the document; nor if it does undertake to recite, can it vitiate, that it recites but partially, and refers imperfectly to the cause. There is no formality of abandonment fixed, as in the case of some other instruments. It may be collected from circumstances. It may be inferred from acts, or from words, carrying the implication of an offer to abandon. Be this as it may, the abandonment in this case is abundantly explicit and formal.
But we come now to the fourth and last question; is this abandonment void from the not offering, or not being willing to offer, a cession of the freight earned before the abandonment.
This is immense, and will amount to more than the 15,000 dollars insured as the value of the ship. That will be a con *368 sideration for him who has the option of abandoning. He is not obliged to abandon. He may pursue for a partial loss. The vessel not having been physically lost, it is but a technical loss that he can allege, and he can waive this if he chooses to take the freight, and claim for a partial loss. Let dispose of the materials, or repair the wreck, as he has done in this case, and claim an indemnification of the damage. In this I am consistent with myself as to my opinion m another case; for I hold it as a convenient rule, and the only one applicable so as to work throughout, that the freight earned before abandonment shall go with the ship, subject to seamen’s wages and the price of provisions. I speak of this as the only rule that will work throughout; for if the insuring the ship is not considered a conditional purchase on the part of the insurer, so as to draw with it the accruing freight, it will lead to the necessity of a divisibility of freight earned, which in all cases cannot be done, as where the ascertaining the pro rata earned is not practicable. Whenever a case of this nature shall occur under a contrary rule to that I adopt, it will be brought up as by a five-bar gate, to use the hunter’s phrase, with the impracticability of applying the rule; and as geometricians demonstrate by showing what will lead to an absurdity, so in the moral sciences we reason from what will lead to an impracticability.
But this is not amongst the reasons filed on the motion for a new trial. It is however a reason which appears, and results from the allegation of an offer to abandon the ship as she was repaired, and from an actual abandonment of the vessel as she was before repair, saying nothing of an offer to cede the freight. The Court will not sanction a verdict contrary to justice or to law, if it appears so to them, though exception be taken on other grounds. The reasons for a new trial are not under an act of assembly, as in the Circuit Courts they were. There we could not go out of the reasons.
The defendant in this case is willing to indemnify and to pay for the loss actually sustained ; leaving the wreck to the plaintiff to make the best of it. The plaintiff says, pay me the stipulated value, and take the hulk. It amounts to the same thing as to justice between the parties; and it is only as it affects a general rule, that it is of moment which way it is. If the ship was injured one half, he will get that; if more, he will get it, under the denomination of a partial loss, the abandonment being considered void. What would he want more for the purpose of an indemnity ?
New trial awarded.