infringement of a patent, is not conclusive that he is entitled to costs: for if the verdict be rendered in pursuance of section 9, Act 1837 [5 Stat. 194], for the infringement of valid claims, while other claims are rejected as void for want of novelty, the plaintiff can not recover costs.

2. Nor does the fact that, since the verdict, the plaintiff has disclaimed one or more of the claims of the patent, deprive him of his right to recover costs. Such a disclaimer might be a ground for a new trial, but so long as the verdict remains in force the plaintiff is entitled to the benefit of it.

3. A disclaimer is necessary only where the thing claimed without right is a material and substantial part of the machine invented.

4. If the disclaimer be of immaterial matters, it would seem that the filing of it does not affect the plaintiff's right to costs.

[This was an action by Eben Peek and others against John Frame and others.]

Motion for the allowance of costs in an action at law referred to in the report of the case of Peek v. Frame [Case No. 10,903]. It appeared that after the verdict was rendered, the plaintiff had filed a disclaimer to some of the claims of the patent in suit, and it was insisted that this was equivalent to a verdict against those claims upon the trial, which would have deprived the plaintiff of the right to recover costs.

Frederic H. Betts, for plaintiffs.
Keller & Blake, for defendants.

[For other cases involving this patent, see note to Myers v. Frame, Case No. 9,991.]

## Case No. 10,905.

PEELE et al. v. MERCHANTS' INS. CO.

[3 Mason, 27.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1822.

MARINE INSURANCE—RIGHT TO ABANDON—INJURY —LESS THAN HALF VALUE—UNDERWRITER'S RIGHT TO POSSESSION.

1. Policy on ship Argonaut and cargo at and from Leghorn to her port of discharge in the United States. Ship sailed on her voyage being owned and bound to Salem. She was cast away, in March, 1820, on a ledge of rocks near Portsmouth harbour (New Hampshire), and immediately bilged. She was in such a desperate situation, that it was nine chances out of ten that she would be totally lost and wrecked in twenty-four hours. In this situation the owners abandoned to the underwriters. There was no verbal acceptance of the abandonment, but the underwriters declined any further agency of the owners, sent their own agent to take possession of the vessel, sell her if he deemed best and act as he chose in all respects as to the vessel; but directing the agent not to meddle with the cargo (specie), which had not been abandoned. The owners never meddled with the ship after the abandonment; but the agent of the underwriters took exclusive possession, and by most extraordinary good fortune and good weather she was gotten off and carried to Portsmouth in

1 [Reported by William P. Mason, Esq.]

about a week. She was injured to about one half her value, and the necessary repairs could not be made in a period short of three months, which was a longer period than the usual length of the voyage insured. After the vessel was got off, the underwriters offered to return her to the owners. They refused to receive her. The underwriters then repaired her in three months under their own agent, and when repaired offered her again to the owners. The latter again refused to receive her; and never authorized the repairs in any shape. They adhered to their abandonment as good, and that henceforth they had nothing to do with the ship. *Held*, that the owners had a good right to abandon under the circumstances, even if the injury was less than one half the value.

[Cited in Columbian Ins. Co. v. Ashby, 4 Pet. (29 U. S.) 145; Northwestern Transp. Co. v. Continental Ins. Co., 24 Fed. 177.]

[Criticised in Bosley v. Chesapeake Ins. Co., 3 Gill & J. 468, 470; Deblois v. Ocean Ins. Co., 16 Pick. 309. Cited in Prince v. Ocean Ins. Co., 40 Me. 487; Snow v. Union Mut. Marine Ins. Co., 119 Mass. 595; Thompson v. Mississippi M. & F. Ins. Co., 2 La. 228.]

2. In estimating that half value, there was not to be a deduction of one third, new for old, as in case of partial loss; the half value, which authorized an abandonment, was half the sum, which the ship, if repaired, would be worth, after repairs made. If the ship when repaired would not be worth double the amount of the repairs, the owners had a right to abandon.

[Cited in Northwestern Transp. Co. v. Continental Ins. Co., 24 Fed. 177.]

[Disapproved in Deblois v. Ocean Ins. Co., 16 Pick. 310, 311. Cited in brief in Lockwood v. Sangamo Ins. Co., 46 Mo. 72. Cited in Taber v. China Mut. Ins. Co., 131 Mass. 250. Cited in brief in Wallace v. Ohio Ins. Co., 4 Ohio, 242.]

3. The underwriters had no right to take possession of the ship, either to move her or to repair her, without the consent of the owners. These acts of taking possession, &c. after the abandonment, were, in point of law, an acceptance of the abandonment, since the underwriters could not be justified in them, except as owners of the property.

[Cited in Gloucester Ins. Co. v. Younger, Case No. 5,487; Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U. S. 433, 10 Sup. Ct. 941; Northwestern Transp. Co. v. Continental Ins. Co., 24 Fed. 177.]

[Cited in Badger v. Ocean Ins. Co., 23 Pick. 358. Cited in brief in Ellicott v. Alliance Ins. Co., 14 Gray, 318; Ellis v. Albany City Fire Ins. Co., 50 N. Y. 402. Cited in Northwestern Transp. Co. v. Thames & M. Ins. Co., 59 Mich. 234, 26 N. W. 344; Peele v. Suffolk Ins. Co., 7 Pick. 256.]

4. An abandonment once made and accepted is irrevocable by either party without the assent of the other.

[Cited in Humphreys v. Union Ins. Co., Case No. 6,871; Copeland v. Phœnix Ins. Co., Id. 3,210; Northwestern Transp. Co. v. Continental Ins. Co., 24 Fed. 179.]

This was a suit by libel [by Willard Peele and others against the Merchants' Insurance Company] on the admiralty side of the court, founded on a policy of insurance.

Nichols & Webster, for plaintiffs.
Saltonstall & Prescott, for defendants.

STORY, Circuit Justice. This cause has been here heard upon the merits, the respondents having appeared under a protest to the jurisdiction, and meaning to insist upon that objection, if there should be an appeal to the supreme court, they have filed a general denial, putting the material facts in issue, and thus brought the entire law as well as facts before the court for consideration. Upon the subject of jurisdiction I have no more to say, than that I have seen no reason to change the opinion which I expressed several years since, that originally and of right the jurisdiction did belong to the admiralty. Whether it is become obsolete by disuse, or by the preponderating authority of the common law courts, so that it cannot and ought not now to be exerted by our courts of admiralty, is a question upon which I have no right even to conjecture what will be the judgment of the appellate court. I have, indeed, hitherto supposed the point rather of theoretical than practical importance, presuming that from private convenience, the benefit of a trial by jury, and the confidence that is so justly placed in our state tribunals, the insured would almost universally elect a domestic forum. I shall most cheerfully acquiesce in any judgment which may be ultimately pronounced on the point of jurisdiction; but entertaining, as I do most sincerely, the opinion, that this court is rightfully possessed of it, I feel myself compelled by a sense of duty to entertain the suit, and to give my deliberate judgment, however unavailing it may be, upon the great and interesting points which have been presented at the bar. I cannot, indeed, but express my deep regret, that the cause has come before this court at all, and especially under circumstances of so much embarrassment and difficulty. My own situation in relation to it is somewhat delicate and perplexing. But every consideration of this sort becomes trivial, when put in comparison with the serious thought, that a very small sum only was originally in controversy; and that there is an almost moral certainty that the whole property will perish before the suit is finally terminated, so that a total loss, with all the expenses and charges of litigation, must be borne by the unsuccessful party. I may add too, that the case appears to be contested upon principle; that the conduct of the parties is perfectly fair; and that there is not the least reason to impute to either, any desire to avail themselves of any rule of law, which is not founded in general justice and equity, and which may not consist with the most liberal good faith in matters of insurance.

The policy on which the suit is brought, bears date on the 6th of December, 1820, and insures for the plaintiffs "thirty thousand dollars on the ship Argonaut, valued at $12,000, and on property on board—viz, $4,000 on the vessel, $26,000 on the property on board, at and from Leghorn to her port of discharge in the United States." The loss is alleged to have been total, by reason of the perils of the sea, stranding and shipwreck. The material facts, as disclosed in the testimony (for there

is some contradiction upon collateral matters) appear to me to be these: The ship sailed from Leghorn on the 2d of February, 1821, in perfectly good order, on her voyage to the United States, having on board a cargo consisting of specie dollars, bags of rags, tile. &c. &c. Nothing material occurred until Saturday the 24th of March, when the vessel, about three o'clock in the morning, went ashore upon Gerrish's Island, near Portsmouth, in New Hampshire. The accident was not in the slightest degree attributable to any fault or negligence of the master or crew, but was occasioned entirely by mistaking the light on the Isle of Shoals for Boston light (both being revolving lights, and the former having been erected since the departure of the ship on her voyage), and also by mistaking Portsmouth light for Baker's Island light, and Boon Island light for Cape Ann light. The place where the ship went on shore was surrounded by breakers, and there being a heavy swell, and the ship having gone head upon the rocks, she strained very much, and thumped very hard, so that it was very difficult to stand upon deck. Every effort was made to get the vessel off, by the crew; and guns being fired for assistance, in the morning they procured it, and landed the specie. About noon the same day, the weather moderated, and lighters were got alongside, and they began to discharge the cargo. In the afternoon of the same day the vessel bilged, some of the planks of the bottom were broken, and large holes made in them, and the tide ebbed and flowed into her within four or five feet of the deck. During the night, on the ebb tide, they got out as much of the cargo as they could. On Sunday a storm commenced about 10 o'clock a. m., and the impression of the master and other persons on board being that the ship would go to pieces, every effort was made to save as much as possible. There were at this time eighty or ninety people on board; and they cut away the running rigging without unreeving it, and cut the sails from the yards in any manner they could for the purpose of saving them, the ship being then considered in imminent danger. About one o'clock that day, the master and all the crew quitted the vessel, deeming it very hazardous to their lives to remain on board, and leaving there a part of the cargo. In the afternoon of the same day the weather moderated, but no attempt was made to get out any more of the cargo on that day. On Monday morning, the 26th of March, they went on board again, and continued to discharge the cargo. During all this period no hopes were entertained of saving the vessel, and her situation was generally deemed one of extreme hazard. The situation where she lay was very much exposed to the sea, and if the wind had blown heavily from any quarter between southwest and northeast she must inevitably have gone to pieces. Different estimates were formed of her value at this time, but the opinion of

the best judges was, that she was worth little more than her materials; and the chance of being gotten off was considered very small, so much so that the premium to insure it was by none valued at less than fifty per cent, and by many intelligent and skilful witnesses was valued at from seventy-five to ninety per cent. Capt. Ramage, of the United States schooner Porpoise, who went on board of the ship on Saturday, in a letter addressed to the owners on the 25th of March (Sunday), and which reached them the same evening, described her situation as follows: "I left her about 7 o'clock last evening, bilged, with eight feet of water in her hold, about a mile and a half to the eastward of the light, and lying on a ledge of rocks, thirty or forty yards from the shore. It is very doubtful whether she can be saved." The substance of this information was communicated to the underwriters the next day, soon after the abandonment. On Monday morning about 10 o'clock, with the knowledge of her previous situation, the plaintiffs, as owners, abandoned the ship to the various underwriters by whom she was insured, and among others, to the respondents; to the Suffolk Insurance Company; and to the New England Marine Insurance Company. The cause assigned in the letter of abandonment was, that the ship was shipwrecked on Gerrish's Island. The abandonment was first handed by Capt. Silver, one of the owners, to Mr. Balch, president of the Merchants' Insurance Company, with a statement of the fact that he had come to abandon the ship. Mr. Balch made no definite reply, opened and perused the letter, and then inquired of Capt. Silver about the situation of the ship, and the cause of the disaster. Capt. Silver, among other things, stated, that Capt. Wheatland, one of the owners, had gone down to Portsmouth, and that he had a paper approving of that proceeding, which he wished Mr. Balch to sign. Mr. Balch expressed his satisfaction that Capt. Wheatland had gone down, but said it was of no consequence for him to sign the paper, for they should of course approve of Capt. Wheatland's proceedings, and the presidents of the offices had had a meeting that morning, and had agreed to send an agent of their own. In like manner, abandonments were made to the other companies, the presidents of which referred to Mr. Balch as the person by whom the business was principally to be conducted. No objection was made by either of the presidents, to the acceptance of the abandonment; and on the other hand no assent, except so far as it may be inferred from the other facts, was given to it. The general practice in these offices is, for the president not to accept abandonments, though from their station; they are generally the medium through which communications are made to the insured. Capt. Silver asked for a copy of the agent's instructions, which Mr. Balch directed his clerk to give him. The following is a copy of those

instructions, signed by the presidents of the three offices:

"Boston, March 26, 1821. Joshua Blake, Esq.—Dear Sir: The ship Argonaut having been stranded on Gerrish's Island, near Portsmouth, and abandoned to the insurers, we have consulted together, and appoint you the agent of the companies we represent, to act and do what is needful in this business. With regard to giving instructions, we have only to say, that we leave to you to attempt to get the ship off, or to sell her as she lies; to sell the materials there, or to send them to Boston; and generally to exercise your own discretion, in which we doubt not you will do whatsoever shall be most for the interest of all concerned. The cargo has not been abandoned—you therefore can have no controul of that; but still we wish you to do all in your power to make the loss as small as possible. Shall be obliged by your informing us, when convenient, what is the situation of the property. Respectfully, &c."

Mr. Blake further states, that at the same time he received a memorandum, as part of his instructions, but which was not seen by the plaintiffs, which after stating certain particulars respecting the ship and cargo, and suggesting what it might be best to do, in case the ship was got off, or was sold, adds: "Capt. Wheatland, one of the owners, is there, and it will be proper to consult him in what concerns the cargo, as he has not abandoned the cargo. If the loss should prove to be less than fifty per cent. on the ship, the abandonment will not take effect. The ship's provisions belong to and make a part of the ship." Mr. Blake went to Portsmouth, saw the state of the ship, and returned to Boston on Thursday morning, leaving a Mr. Hawkes as the agent for the underwriters, with authority to endeavour to get the ship off, and proceed in every respect as to him should seem best for the preservation of the ship and property, during his absence, or until another agent was appointed by the underwriters; and this agency was confirmed by the three presidents by the mail of the next day. Mr. Hawkes accordingly set to work with forty or fifty men, and eventually succeeded, by great exertions, and the use of rags, beef, &c. in stopping the principal leaks, and getting the vessel off, though the weather was unfavourable, and with the assistance of about twenty boats, on Friday, the 30th of March, towed her up to a wharf in Portsmouth. There were several holes in the bottom of the ship, lying principally within the space of six feet. From the time of the abandonment, the ship owners ceased to have any thing to do with the ship; they never assented, and were not asked by the underwriters to assent, to the appointment of Mr. Blake or Mr. Hawkes as agent, and the whole proceedings to get the ship off, were exclusively directed by the underwriters and their agents, at their own cost and expense. The expense of getting off the ship was about $907. On Monday, the 2d day of April (a week after the abandonment), and not before, Mr. Balch, in behalf of the Boston companies, informed the plaintiffs by letter that the ship was got off, offered to make a compromise, and wished them to take the ship and repair her. He added, "Should we not agree in this, it is our intention to have the ship repaired as soon as practicable, and to return her to you." This letter was never answered. About the 8th of April, the underwriters sent an agent to Portsmouth, to make an estimate of the necessary repairs to put her in as good order as she was before, who estimated the gross amount, making the most liberal allowance, at $5,412. As soon afterwards as could conveniently be done (about the 20th of April), the repairs were begun, under the direction of a skilful and intelligent agent; and all the repairs were made by him according to his best judgment, with suitable instructions from the underwriters, and were completed about the 19th day of June, 1821. The underwriters on the 23d of June, wrote a letter to the owners, stating the fact, that the vessel was repaired, and offered to deliver her to them. The plaintiffs on the 26th of June, replied, rejecting the offer, and relying on their abandonment as accepted, and offered to execute a further transfer, reciting according to the laws of the United States, the certificate of registry. They also declined to agree to the proposal of a sale of the ship without prejudice, assigning as a reason the insufficiency of the repairs, &c. To this letter the defendants replied on the next day, (the 27th June) denying any acceptance of the abandonment, and expressing surprise at the assertion, and added: "On your informing us that the ship was ashore and bilged, and in a situation in which it was not probable she could ever be got off, and that you therefore wished to abandon; under the impression that your information was correct, we sent an agent with full powers to act as he should think proper, after he should have ascertained the facts; but on his arrival he found the facts materially different—the ship was not bilged, although her keel was badly chafed, and she leaked badly; nor was she in so desperate a situation as we had been led to believe. He therefore took measures immediately to get her off, and easily succeeded, and carried her to the wharf, where she now lies." The plaintiffs replied to this letter on the 9th July, declining any further correspondence. The defendants again wrote the plaintiffs on the 28th July, stating, that an offer had been made for the ship of $11,000, and that the agent thought he could get $12,000, if he was authorized to sell her, and proposed giving him authority to sell her. No reply was made to this letter, and here the correspondence closed. The ship yet remains at the wharf in Portsmouth; and recently, the leak, which after the repairs continued for many months, has ceased, but the place where it is, and the manner in

which it has stopped is unknown. Such appear to me to be the material facts of the case. There is, indeed, upon minor points, a diversity of testimony, which has employed the diligence and zeal of the parties; but which in my judgment bear so remotely upon the great points of the cause, that I have not thought it necessary to sift it with minute accuracy. As to the question of the sufficiency of the repairs, that is so dependent upon practical skill in nautical affairs, that if the cause were to turn upon it, I should, according to the known course of the admiralty, refer it to experts to report upon the whole evidence, what in their judgment is the true posture of the case in this respect.

The questions made and discussed at the bar with great diligence, learning and ability, from which I have derived no small share of instruction, and have been taught the intrinsic difficulty of the subject, are first, whether the plaintiffs had a right of abandonment upon the 26th of March, under all the circumstances of the case; secondly, whether, assuming that there then existed no such right, there was an acceptance on the part of the underwriters of the abandonment tendered by the plaintiffs, so that they are now bound to pay as for a total loss. As preliminary to the first enquiry, I think it important to notice a difference between the courts of this country and those of England, in respect to the right of abandonment. With us, an abandonment once rightfully made, is conclusive between the parties, and the rights flowing from it are not divested by any subsequent events, which change the situation of the property, and make that, which was a total loss at the time of abandonment, a partial loss only. And the right of abandonment is to be decided by the actual facts at the time of the abandonment, and not merely by the information of the assured; and consequently, if the facts do not then warrant it, no prior or subsequent events will give it any greater efficacy. This is the established doctrine, as I take it, of all, or at least of the principal commercial states (Wood v. Lincoln & K. Ins. Co., 6 Mass. 479; Adams v. Delaware Ins. Co., 3 Bin. 287; Jumel v. Marine Ins. Co., 7 Johns. 412); and has been solemnly settled, upon the fullest deliberation, by the supreme court of the United States (Rhinelander v. Insurance Co. of Pennsylvania, 4 Cranch [8 U. S.] 29; Marshall v. Delaware Ins. Co., 4 Cranch [8 U. S.] 412). Whether this decision has given entire satisfaction to the profession, is more than I can presume to say; and whether at a future time it may be fit to undergo a revision, as has been intimated at the bar, I pretend not to determine. I can only say, that the decision already made, is conclusive upon my present judgment; and so far as I have been able to comprehend the grounds on which it rests, it appears to me founded on sound reasoning, public convenience, and the great principles of equity, which regulate the contract of insurance. The rule in the English

courts is, as we all know, very different. There it has been held, that if an abandonment be rightfully made, it is not absolute, but may be controlled by subsequent events; so that if the loss has ceased to be total at any time before action brought, the abandonment becomes inoperative. M'Carthy v. Abel, 5 East, 388; Bainbridge v. Neilson, 10 East, 329; Patterson v. Ritchie, 4 Maule & S. 393. The cases in which this doctrine has been asserted, do not to my humble judgment, present any solid reasons to support it. They appear to me to trench very much upon the true principles of abandonment, and to be supported by analogies not very exact, or very cogent. And I find that they have struck the comprehensive and discriminating mind of Lord Chancellor Eldon in the same manner. Smith v. Robertson, 2 Dow. 474. The doubts which he has thrown out have not been as yet satisfactorily answered. And it is no slight recommendation of the American doctrine, that it stands approved by the cautious learning of Valin, the moral perspicacity of Pothier, and the practical and sagacious judgment of Emerigon. 2 Valin, Comm. 143, lib. 3, tit. 6, art. 60; Pothier, c. 3, note 135; 2 Emerig. c. 17, § 6, p. 194. And see Roccus, Ins. note 66.

It appears to me that this distinction has not at all times been sufficiently adverted to in our examination of the later English cases. Some of the remarks to be found there have a tacit reference to this doctrine; and many things thus receive an easy explanation, which it would otherwise be found somewhat difficult to reconcile with our stricter notions on the subject of abandonment. It has been said too at the argument, that abandonments are not to be favoured; that they have been liable to great abuses, and that courts of law are not disposed to enlarge the practice. See Lord Ellenborough's remarks in Bainbridge v. Neilson, 10 East, 329, 343. I am very much inclined to believe, that of late years this consideration has had quite as much weight as it deserved; and it is by no means clear, if the spirit of the cases decided by that great man, Lord Mansfield, had been fairly followed, that much uncertainty as to the law would not have been done away, and many fruitful sources of litigation dried up. At present there is enough of doubt and obscurity as to the right of abandonment in cases of sea damage, stranding, shipwreck, and loss of the voyage by the ship, to encourage expensive suits, and to lead one to the conclusion, that it were far better for the question to be settled upon some general principle in any way, than to remain in its present condition.

The plaintiffs contend that they had a right to abandon, (1) because the ship at the time was cast ashore and bilged, and in so dangerous a situation that the chance of recovery was desperate; (2) because she was injured by the accident to more than half her value, which of itself constituted a technical total

loss. Much minute criticism has been employed upon the language of the witnesses in describing the state of the ship; and I observe that the underwriters in their letter of the 27th of June, lay great stress upon the circumstance, that at the time of the abandonment the vessel was represented to be bilged; and it has been strenuously argued that she was not in fact bilged. It appears to me that in the nautical sense of the phrase she was bilged, understanding that phrase to import in common usage, as well as in the opinion of lexicographers, that state of the ship, in which water is freely admitted through holes and breaches made in the planks of the bottom, occasioned by injuries, whether the ship's timbers are broken or not. But waving all question on this point, what in fact was the situation of the ship at the period of abandonment? She lay on a ledge of rocks on a dangerous and exposed shore. Her bottom was broken through, so that the tide was freely admitted into her hold through several holes. Her cargo was from necessity discharged. Her sails and rigging were cut from the masts, and all her furniture was removed for safety. The master and crew had deserted her, expecting her to go to pieces, and her situation was one of extreme hazard. The chance of getting her off was small; and if gotten off, the expense of this, and the necessary repairs, must be very great. I do not say it would be one half her value, for that is a point which will be hereafter considered. The repairs alone, in the opinion of an agent of the underwriters, who at a subsequent period examined the vessel after she was in safety, and with the best means of judgment, would be upwards of $5,000; and in point of fact, the repairs actually made fell very little short of that sum; and the expense of getting the vessel off was upwards of $900; and if the first attempt had not been successful, might greatly have exceeded that sum. So that in addition to the other facts of the case, we have that of actual injury and expense to an amount nearly equal to half the valuation of the ship in the policy. And I may add to all this, that the requisite repairs could not at that season of the year be made in a period much short of three months, a period equal to the usual length of the voyage insured. Under such circumstances, I must say, that if there ever was a case for an abandonment upon a stranding or shipwreck, call it as you may, where the damage was less than fifty per cent. and the vessel was in extreme peril, yet if gotten off was repairable, scarcely could a stronger case be wished or imagined than the present. Still, if the law be otherwise, it is certainly not for me to attempt to ingraft a new principle into the doctrine of insurance. I am content on this, as on all other occasions, as a duty best fitted to my humble talents, to administer the law as I find it. and to give the parties, who stand upon their rights, the fullest benefit of that law. I will take occasion here also to remark, that we are not to judge of this case by subsequent events, except so far as they operate by way of evidence upon the preëxisting state of the ship. The right of abandonment depended altogether upon the facts as they then were, and upon the conclusions which reasonable men ought then to draw from them in the exercise of a sound discretion.

It has been very justly stated, that a total loss in the contemplation of law does not necessarily suppose the actual destruction of the thing insured. It may technically exist, when the thing is in safety, but is for the time being lost to the owner, or taken from his free use and possession. Such are the common cases of total losses by capture, by embargoes, and by restraints and detainments of princes. On the other hand, it is as clear, that the mere occurrence of these accidents does not constitute a total loss, if, in point of fact, the peril has passed away at the time of the abandonment. Lord Mansfield, upon one occasion said, "no cases say that the bare existence of the hull of the ship prevents the loss from being total." Milles v. Fletcher, 1 Doug. 231. And on another occasion he observed, alluding to the objection, "it might as reasonably be argued, that if a ship sunk be weighed up again at a great expense, the crew having perished, the insured could not abandon, nor the insurer be liable, because the body of the ship was saved." Goss v. Withers, 2 Burrows, 683, 697. See, also, 2 Emerig. Ins. c. 17. § 2, p. 181; 1 Emerig. Ins. c. 12, § 13, p. 400. On the other hand, Lord Ellenborough has told us, that "there is not any case nor principle, which authorizes an abandonment, unless where the loss has been actually a total loss, or in the highest degree probable at the time of the abandonment." Anderson v. Wallis, 2 Maule & S. 240, 248. I lay great stress on these last words, because it is manifest from the case, that they were used with reference to a technical total loss, and shew that the right of abandonment does not always depend upon the certainty, but upon the high probability of a total loss either of the property or voyage, or both. And in one of the latest cases ever decided by the same learned judge, he uses expressions indicating a perfect coincidence with the opinion of Lord Mansfield. He there observed, "the mere restitution of the hull, if the plaintiff may eventually pay more for it than it is worth, is not a circumstance by which the totality of the loss is reduced to an average loss." M'Iver v. Henderson, 4 Maule & S. 576, 584. See, also, Bell v. Nixon, 1 Holt, N. P. 423. I think, therefore, that it may be assumed as a position not now controverted, that the existence of the ship does not prevent the loss from being considered total to the owner. Peters v. Phœnix Ins. Co., 3 Serg. & R. 25.

What then is the criterion by which we are to ascertain when a total loss of a ship has

taken place, so as to justify an abandonment? Or, to bring it down more closely to the present case, what is a total loss in cases of sea damage, stranding and shipwreck? It is stated, and the position seems incontrovertible, that the mere stranding of the ship is not of itself to be deemed a total loss, so as to entitle the insured immediately to abandon. Marsh. Ins. (Condy's Ed.) bk. 1, c. 13, § 1, p. 582. The reason is obvious. It may occasion but a slight injury easily repaired, and the vessel may be gotten off with a small expense, and the retardation of the voyage be trivial and unimportant. But the stranding may be attended with circumstances which would justify an abandonment, even though the hull of the ship should not be materially damaged. As, if she should be driven by a violent hurricane (such as occurs in the tropical climates, and sometimes even in our own) upon a high and sandy beach, or other place, so distant from the shore, or the means of adequate relief, that the expense of 'removal would exceed the value of the ship. Such a case is evidently contemplated in the treatises where the general doctrine is asserted. Id. bk. 1, c. 13, § 1, p. 582; 1 Emerig. c. 12, § 13, pp. 407–411; 2 Emerig. c. 17, § 2, pp. 180, 181; Poth. Ins. note 116; 2 Valin, Comm. lib. 3, tit. 6, art. 46, p. 102. And see Fontaine v. Phœnix Ins. Co., 11 Johns. 293. But although a mere stranding will not justify an abandonment, yet, it is said, a stranding which is followed by shipwreck, or which in any other way renders the ship incapable of prosecuting the voyage, will. Marsh. Ins. bk. 1, c. 13, § 1, p. 583. That again is a proposition, which in part depends upon what constitutes a shipwreck in contemplation of law. If the definition of Mr. Marshall (Marsh. Ins. bk. 1, c. 13, § 1, p. 582) be assumed as correct, that shipwreck, is when the ship is so broken, disjointed, or otherwise injured, that it no longer exists in its original nature and essence, (for though the wreck may remain, yet the ship is lost) there can be no doubt of the doctrine. A learned judge in our own country has given a somewhat different definition, which it has not been denied at the argument, would constitute a good cause of abandonment. He says, "A ship becomes a wreck, when, in consequence of the injury she has received, she is rendered absolutely innavigable, or unable to pursue her voyage without repairs exceeding the half of her value." Wood v. Lincoln & K. Ins. Co., 6 Mass. 479, 482. The accuracy of this definition has been questioned, as it points rather to the circumstances which constitute a total loss justifying an abandonment, than to the nature of the injury and state of the ship. Innavigability is by foreign writers distinguished from shipwreck; and the former is often applied to the ship, when in consequence of accidents, she is incapable of being repaired, or the repairs would cost as much as a new ship. 1 Emerig. c. 12, § 12, p. 399;

Id. § 38, pp. 575, 591. Emerigon appears to me to have defined the term in a manner more comformable to its nautical, as well as legal sense. After giving the etymology of the term "naufrage" (naufragium), he says, there are two kinds of shipwreck; the first, when the ship is submerged or sunk so that no permanent vestige remains upon the surface of the water; the second, when the ship, being stranded, has an opening through which the sea water is admitted so as to fill her hold, although she does not absolutely disappear. Id. c. 12, § 12, pp. 400, 403; Id. § 13, pp. 408, 409. In both cases he considers the owner entitled to abandon, not, as was intimated at the bar, upon any peculiar provision of the French ordinance, for that ordinance allows abandonment in cases of shipwreck generally, leaving the import of the term to be ascertained by usage as in other cases, but upon the just principles of interpretation. That the first kind of shipwreck enumerated by Emerigon, is in our laws equally as in the French law, a good cause of abandonment, cannot be reasonably doubted. In the case of Goss v. Withers, Lord Mansfield, in his reasoning already cited, puts the point as clear to illustrate the right of abandonment. In Anderson v. Royal Exch. Assur. Co., 7 East, 38, 42, which was a case of submersion of ship and cargo, Lord Ellenborough said, that during the time of the submersion, the cargo might have been treated as a total loss; and in Davy v. Milford, 15 East, 559, 564, where this case was cited, he manifestly applied the same doctrine to the ship, declaring that during the submersion the ship ceased to exist for any useful purpose. The latter kind of shipwreck stated by Emerigon, is that alone upon which we might pause, as necessarily constituting a case for abandonment. If our law were like the French, there would be an end of the present controversy, for the facts of this case bring it completely within the definition of Emerigon. But I take it to be clear, that our law does not turn upon niceties as to the meaning of the word shipwreck; and that if a shipwreck does occur without material injury to the vessel, so that she may be repaired in a reasonable time at a moderate expense, and resume her voyage, no right of abandonment attaches. So that after all, whether a right of abandonment exists or not, is to be judged from all the circumstances of the case, and not from any arbitrary meaning attached to a particular word, or a particular posture of the ship.

The cases on this subject are not perhaps easily reconcilable in their full extent; but it appears to me important to review them for the purpose of ascertaining what at least is the leading principle. The first is Goss v. Withers, 2 Burrows, 683, which it is material on many accounts to consider. There was an insurance in that case, and the suit was brought on both policies; the declaration in that on the ship (which was a valued policy)

alleged a total loss by capture; that on the cargo, a total loss by jettison and capture. The judgment, therefore, of the court, must be considered as applied to both, reddendo singula singulis. The insurance was at and from Newfoundland, to her port of discharge in Portugal or Spain without the Streights, or England. The ship sailed on her voyage, was captured by the French and her crew taken out, and afterwards was recaptured and brought into Milford Haven, in England, and immediate notice was then given to the insurers, by the insured, with an offer of abandonment. Before the capture, the ship suffered so much from a storm, that she was disabled from going on her destined voyage, without going into port to refit—part of the cargo was thrown overboard in the storm, and the rest was spoiled while the ship lay at Milford Haven, after the offer to abandon and before she could be refitted. Lord Mansfield, after stating that the loss was total by the capture during its continuance, said, that the subsequent recapture was at best saving only of a small part,—half the value must be paid for salvage—the disability to pursue the voyage continued—the master and mariners were prisoners—the charter-party was dissolved, and the freight, except pro rata, lost. The ship was necessarily brought into an English port; and what might be saved, might not be worth the expense of saving it. He afterwards added, that the loss as to the ship could not be estimated, nor the salvage of one half be fixed, by a better measure than a sale. In such a case, there was no colour to say that the insured might not disentangle himself from the unprofitable trouble and further expense, and leave the insurer to save what he could. The parts of the opinion which I have selected, are manifestly addressed to the case of the ship, and they demonstrate the opinion of the court, that though the hull was safe and reparable in a home port, yet as the salvage was one half, and the expense of repairs considerable, and the voyage was in fact lost, the abandonment was good, thus combining all the facts as the ground of decision.

Then came Hamilton v. Mendes, 2 Burrows, 1198, which was a valued policy on the ship, and on goods on board, on a voyage from Virginia or Maryland, to London. The vessel was captured on the voyage, and was retaken and brought into Plymouth; and afterwards the plaintiff offered to abandon, but the underwriter refused it, and offered to pay the salvage and losses, and charges occasioned by the capture. The ship afterwards came to London, where the cargo was delivered to the freighters, and the ship sustained no damage by the capture. The plaintiff claimed for a total loss, on account of the capture, and the court held it a partial loss only. Lord Mansfield among other things said, "It does not necessarily follow, that because there is a re-

capture, therefore the loss ceases to be total. If the voyage is absolutely lost, or not worth pursuing; if the salvage is very high; if further expense is necessary; if the insurer will not engage in all events to bear that expense, though it should exceed the value, or fail of success; under these, and many other like circumstances, the insured may disentangle himself and abandon, notwithstanding a recapture." He then proceeded to show, that none of these circumstances occurred in the case before the court, and in this respect it was distinguishable from Goss v. Withers. I know very well, that Lord Ellenborough, on a late occasion, (Falkner v. Ritchie, 2 Maule & S. 290, 293,) complained of the looseness and generality in these expressions, as inclining him to pause upon them, and referred to Pole v. Fitzgerald, Willes, 641, as fit to be resorted to, in order to purify the mind from these generalities. On this I have only to observe, that these cases have been acted upon for more than a half century, and have never been shaken. And as to Pole v. Fitzgerald, whatever may be its authority, seeing that it was opposed by the judges of the king's bench, at the head of which there then presided one of the greatest insurance lawyers of his day, it may be well doubted if some of the dicta in it now stand commended to the judgment of the profession. See the observations of Lord Eldon in Brown v. Smith, 1 Dow. 350, 358. And if I do not mistake, Lord Ellenborough himself, on more than one occasion, has reposed his judgment upon the authority of these very cases.

Then came the case of Milles v. Fletcher, 1 Doug. 231, which was an insurance on the ship and freight from Montserrat to London. The vessel was captured on the voyage, and part of her cargo was taken out. She was afterwards retaken and carried into New York, where the captain on his arrival found that part of the cargo was washed overboard, and part of the residue was damaged, and the ship was leaky, and could not be repaired without unloading. The owner had no storehouse at New York, to store the cargo, nor any agent there. No sailors were to be had, and the only way of paying the salvage was by selling part of the cargo. The expense of repairs would have exceeded the value of the freight by £100. There was an embargo on all vessels at New York till the 27th of December, and the ship by her destination was to have arrived at London in July. Under these circumstances, the master, after consulting his friends, sold ship and cargo. The latter was paid for; but the person who had contracted to buy the ship, ran away, and she was left in a creek at New York. The owner afterwards, on information, abandoned, and it was held a total loss. Lord Mansfield, in delivering the opinion of the court, affirmed the doctrines already stated by him in the

former cases, and relied on them as grounds of decision. He considered the case as one of a total destruction, and not a partial stoppage of the voyage; that it was best to sell the ship, that the expense would have exceeded the freight, and that the expense of bringing her home, might have been more than she would have sold for in London; and therefore he considered that the loss continued total, notwithstanding the recapture. It is material in this case to observe, that the contract of sale of the ship was not consummated; that the damage done her was not pretended to exceed half her value, but only exceeded her freight for the voyage; and that she was left by the master in a state of safety at New York, and continued so, for aught that appears, up to the time of abandonment. Here then was a case, where the injury was less than fifty per cent. of the value, and yet from other circumstances the abandonment was held to be good.

The case of Furneaux v. Bradley (Park. Ins. c. 9, p. 219), followed. The insurance was on the ship, in port or at sea, for six months, from 18th July, 1777. The ship was in government service, bound from Cork to Quebec. She arrived there, but the season being far advanced before she was ready to return, she was removed into the basin; but on the 19th November she was driven from thence by a field of ice, and damaged by running on the rocks. Her condition was not examined till April following, after the expiration of the policy. She was then found to be bilged, and much injured, but not thought irreparably so. In the progress of the repairs, difficulties arose from the want of materials, and the captain, after consulting the merchants and agents, sold her. An account was made up, charging the insurers with the whole amount, and crediting them with the sums for which the ship sold as salvage. After argument, the court held that the loss in November should be taken as an average, and not as a total one; that the ship should be considered as damaged on the 19th November, but not totally lost. The grounds of this determination are not stated in the report; but there seems no reason to doubt its correctness. The question turned altogether upon the quantity of damage done in November; and the court thought it merely partial. There does not appear to have been any abandonment, nor could it have been well made for any injury sustained subsequently to the 17th of January, when the policy expired; and without an abandonment in a reasonable time, there could be no recovery for a total loss. See Mitchell v. Edie, 1 Term R. 608; Da Costa v. Newnham, 2 Term R. 407; Martin v. Crokatt, 14 East, 465; Davy v. Milford, 15 East, 559; Bell v. Nixon, 1 Holt, N. P. 423. The voyage was not lost by the accident, for the vessel did not intend to return that season,

and before, by the opening of the river in the spring, the voyage could be resumed, the policy had expired. The court clearly did not consider, that if the voyage had been lost, an abandonment would not have been good; for that would have been contrary to their prior as well as subsequent decisions. Chief Justice Parsons has commented on this case with the same views. Wood v. Lincoln & K. Ins. Co., 6 Mass. 479, 485, 486.

The next case was Manning v. Newnham, Park. Ins. c. 9, p. 221. See Marsh. Ins. 586; s. c. 2 Camp. 624, note. It was an insurance on ship, cargo, and freight, at and from Tortola to London, warranted to depart before a particular day, and free of particular average. The ship was a Dutch prize, and sailed on the voyage under convoy, and on the second day afterwards was compelled, in consequence of leaks occasioned by stress of weather, to return to Tortola. A survey was there had, and the ship declared unfit to proceed to London, and that she could not be repaired at Tortola, or any of the English West India Islands. No ship could be had at Tortola, to bring the whole or the greater part of the cargo to London; and the cargo did not appear (as one of the reports states) to have received any special damage; and was sold for £700 within the sum in the policy, which was above £12,000. The ship, and the whole of the cargo, was sold accordingly at Tortola. The assured claimed for a total loss, and the jury found a verdict in his favour. On a motion for a new trial, it was overruled. Lord Mansfield said: "If by a peril insured the voyage is lost, it is a total loss. In this case, the ship has an irreparable hurt within the policy; this drives her back to Tortola, and there is no ship to be had there, which could take the whole cargo on board. It is admitted there was a total loss on the freight, because the ship could not perform the voyage. The same argument applies to the ship and cargo." The ground of decision, therefore, was, that the voyage as to the ship was lost by the impossibility of her being repaired in that or the neighbouring ports, so as to complete the voyage; but the question of the quantity of injury received by the storm, was not made in the cause. I am aware that Lord Ellenborough, in Anderson v. Wallis, 2 Maule & S. 240, 246, seems inclined to doubt this case, but I find that in another case he distinctly acceded to its authority. Wilson v. Royal Exch. Assur. Co., 2 Camp. 623.

The case of Cazalet v. St. Barbe, 1 Term R. 187, 190, 191, was a policy on the ship from Wyberg to Lynn. In the course of the voyage the ship received damage to the amount of forty-eight per cent., which sum the underwriters paid into court. She arrived at her port, and so performed her voyage, but on arrival she was not worth repairing. The question was, whether the

plaintiffs had a right to abandon; and the court held that they had not, as, by the express finding of the jury, the loss was a partial loss of forty-eight per cent. Willes, J., said, "There had been no loss either of the ship or the voyage; but being an old ship, she suffered so much that she was not worth repairing." Buller, J., said, "It has been said that the insurance must be taken to be on the ship as well as the voyage; but the true way of considering it is this, it is an insurance on the ship for the voyage; if either the ship or the voyage be lost, that is a total loss; but here neither is lost." Da Costa v. Newnham, 2 Term R. 407 (and see Parsons v. Scott, 2 Taunt. 363), deserves some attention. It was an insurance on the ship from Leghorn to London. In the course of the voyage she met with an accident, and was obliged to put into Nice to repair. Advice thereof was transmitted to the owner, and that it was necessary to unload the vessel, and that a considerable expense must be incurred. The information was communicated to the underwriters, and an altercation arose between the owner and the underwriters, he being desirous of abandoning altogether, and they insisting upon the vessel's being repaired, and telling him to pay the tradesmen's bills. He consented at last that the repairs should be done, but refused to advance the money; in consequence of which it became necessary to take a large sum on a bottomry bond. Before the repairs the crew were discharged, and several were hired on daily pay. The ship was refitted and resumed her voyage and gained freight, but on her arrival at her port of discharge, the underwriters having refused to take up the bottomry bond, she was obliged to be sold to pay the debt, and was sold for 600 guineas, so that she never came freely into the owner's possession. Under these circumstances, Buller, J., at the trial, directed the jury that there had not been a total loss at Nice, for though the plaintiff had offered and was entitled to abandon, yet in truth he had not abandoned. But he thought, that as the subsequent injury had occurred to the plaintiff, from the neglect of the underwriters to pay the bottomry bond, which was only £600, and she was therefore sold for 600 guineas, the underwriters were bound to pay the whole amount of the insurance. On a motion for a new trial, the court held the direction right. Ashurst, J., said, "At that period the plaintiff might have abandoned, if he pleased, for the ship was then in a situation not worth repairing, and that was notified to the underwriters; but he did not abandon as he might have done; and upon their insisting that the vessel should be repaired, he undertook the management of it; but that was at the risk of the underwriters." The other judges of the court sustained his reasoning. It is material to observe in this case, that the ship does not appear to have been injured more than one-half her value; and she was repaired, and actually performed her voyage. It is true that one of the learned judges declared that she was not worth repairing; but that might have been (as in Cazalet v. St. Barbe,) although injured less than one-half in value; and although she sold for less than the bottomry bond, that is not decisive of the cost of repairs, for it included other charges; and the verdict was founded upon the ground, that in the event the plaintiff was entitled to recover as if the loss had been total. It is perhaps difficult to ascertain, what was the precise ground on which the court held the plaintiff originally entitled to abandon. It may have been, that the damage exceeded fifty per cent.; or that in the predicament of the ship she was not worth repairing; or that the underwriters refused to make the necessary advances.

Parsons v. Scott, 2 Taunt. 363, was an insurance on the ship, which was captured, and afterwards liberated, and returned to England, not having performed her voyage, and an abandonment took place. Upon the first argument, Chief Justice Mansfield admitted, that if a capture has occasioned the loss of the voyage, although the ship remains in such a state that she may be repaired, and may again be taken possession of by the owner, yet it is a total loss. But he said the question was, what shall be deemed a loss of the voyage; and adverting to Goss v. Withers, remarked, that Lord Mansfield took various circumstances into consideration; the nature of the commodities, the defeating of the voyage, the amount of salvage, the captivity of the crew, and the loss of the freight. Lawrence, J., admitted that the dicta in the authorities went the length of asserting generally, that wherever the voyage is defeated by any of the perils insured against, there is a total loss; but that he could find no authority applicable to the case of a ship in the hands of the owner in the country where he resides. He added, that in Manning v. Newnham, a loss of the voyage as to the ship did arise, though not as to the cargo. On the second argument, the court held that there was no total loss. I advert to this case, to show that the cases alluded to were not attempted to be overthrown, but their authority admitted, and the case before the court was distinguished from them.

Shortly afterwards came the case of Martin v. Crokatt, 14 East, 465 (see, also, Bell v. Nixon, 1 Holt, N. P. 423), which was an insurance on the ship and goods from Carlscrona in Sweden, to Deptford or London, warranted free of particular average, &c. The ship on the voyage was run foul of by another vessel in a gale of wind, and from that and other perils of the sea, received so much damage as to be obliged to put into Warberg Roads, a small fishing place in

Sweden, where she was surveyed, and reported to be incapable of proceeding on her voyage, without a thorough and very expensive repair. The assured, without giving notice of abandonment, laid the intelligence before the underwriters, and required their directions; but they refused to interfere. Upon which the insured directed a sale of ship and cargo, (which latter was undamaged) for the benefit of all concerned; but the proceeds of the sale, after deducting the expenses and salvage, left a small balance against the insured. It was contended, that as the damage, which in the event had turned out a total loss, was occasioned by a peril insured against, and the voyage was thereby defeated, it was to be treated as a total loss, with benefit of salvage. But Lord Ellenborough thought at the trial, that as there was no abandonment, it could not be treated as a total loss, since the ship continued to subsist in specie in the place whither she was carried. And this opinion was upon argument supported by the court. Lord Ellenborough then said, that where the thing subsists in specie, an abandonment is necessary; and if upon the happening of such a peril, which suspends the voyage and induces the necessity of repairs, the owners choose to make it a total loss upon the loss of the voyage, or the probable estimate of the expenses of repairs, absorbing the value of the thing insured, they ought to abandon, to enable the underwriters to elect whether or not they will incur such expenses.

In Thomson v. Royal Exch. Assur. Co., 1 Maule & S. 30, which was a policy of insurance on bottomry on the ship, at and from St. Christophers to London, it appeared that the ship was much disabled by storms in the voyage, and narrowly escaped foundering at sea; but was towed into Falmouth. A survey was then made of the state of the ship, and the expense of repairs, when it was found that it would amount to £3,200, and after their completion she would be worth only £2,000. The owners therefore broke her up and sold her. Her value, when she left St. Christophers, having been £4,000. The decision turned upon the point, that in cases of bottomry there must be an absolute destruction of the thing to entitle the insured to recover. And Lord Ellenborough, in noticing the distinction between a policy on the ship, and on the bottomry bond, said in the former case, if the voyage be lost, or the ship be reduced to such a state, that she cannot proceed without refitting, the expense of which would greatly exceed her value, the insured may abandon and recover as for a total loss. The language of the learned judge without doubt referred to the case before him, which was treated as clearly a technical total loss of the ship. And yet if the value at the time of departure on the voyage be taken, and a deduction be made from the necessary repairs of one third new for old, it is manifest that the damage was less than one half of that value.

Another case, which I think it necessary to notice, is Thornely v. Hebson, 2 Barn. & Ald. 513, when in consequence of severe injuries occasioned by storms, the ship was deserted by the crew, and afterwards was taken possession of by volunteers from another ship, and brought into port, and a moiety decreed as salvage, and the ship sold to pay it. In a suit on a policy on the ship, the court held that the owners had no right to abandon and recover for a total loss, because it did not appear that they had made any exertions to pay the salvage, and thus prevent the sale of the ship. Upon this case I have only to observe, that I do exceedingly doubt its authority, for the injury and loss to the owner in every event must have exceeded half the value. See Marine Ins. Co. of Alexandria v. Tucker, 3 Cranch [7 U. S.] 357. It has been supposed at the bar, that this case establishes the doctrine, that desertion of the ship at sea, in consequence of perils insured against, does not authorize an abandonment. I cannot admit this conclusion, for the abandonment was not made until after the ship was recovered, and had arrived in port. There is not a single dictum in any English case, which shows that an abandonment during the time of such desertion would not be good, whatever might be the effect of a subsequent recovery upon the title of the plaintiff.

Falkner v. Ritchie, 2 Maule & S. 290, is a strong case. The insurance was on a ship at and from Cadiz to any ports or places on the coast of Africa, during her stay and trade there, and thence to Cadiz and Lisbon. The vessel sailed on the voyage, and arrived on the coast of Africa, and the crew, while the master was on shore, seized the ship, and carried her to South America. There, after plundering, they deserted her except one black man, and she was there taken possession of by part of the crew of a British ship of war, and afterwards sent to England. Part of her rigging was gone, and she could not be made fit for the voyage again without considerable expense, and providing a crew and stores. The owners abandoned, but the underwriters refused the abandonment; and the court held the loss to be a partial loss only, upon the ground, as it should seem, that there was a retardation or suspension only, and not a destruction, of the voyage, as to the ship. And Lord Ellenborough asked, what the loss of the voyage had to do with the loss of the ship. In respect to this case it is not necessary to say much. It does not appear to me to be reconcileable with Brown v. Smith, 1 Dow. 349, in the house of lords, where, under circumstances very similar, it was holden by the highest authority, that the insured had a right to abandon as for a total loss.

The latest case is McIver v. Henderson, 4 Maule & S. 576, where the insurance was upon the ship at and from Liverpool to Sierra Leone. The ship sailed on the voyage, and was captured by the French; part of her crew were taken out, and part of her cargo plundered and thrown overboard, and also the greater part of her stores, and provisions, and guns, and all the ammunition. The captors then gave her up to the master of a Portuguese schooner, which they had previously captured and burnt, who finally arrived with her at Fayal. The Portuguese master here claimed the ship as a donation, and instituted proceedings in the court there to enforce it. Pending the proceedings, the original master obtained leave to sell, and did sell the remaining part of the cargo, and ultimately a decree of restitution to him was decreed, from which decree the other party appealed. The proceeds of the sale of the cargo were applied in part to the payment of expenses, and the remainder the master was obliged to leave in the hands of a Portuguese, to answer the Portuguese master's further appeal, in order to obtain a release of the ship. The original voyage, from the loss of the cargo and the other causes, and the want of stores, which could not be procured at Fayal, became impracticable, and the ship returned to Liverpool. When she left Fayal, she could not have been sold there for more than £600, but was worth, to be sold at Liverpool, £1,300. The expense of navigating her from Fayal to Liverpool was £221, and the sum deposited at Fayal to abide the event of the appeal was £427. After the decree of restitution, and pending the appeal, the owner abandoned; and the question was, if the owner was entitled to recover for a total loss; and the court held that he was. Lord Ellenborough, after the remarks which I have already quoted, said, "The voyage is lost, the cargo which was to be conveyed in the ship is wholly gone, she is stripped of a great part of her necessary equipments, stores and furniture, and the ultimate recovery of any thing is uncertain, and attended with the trouble, expense, and hazard of litigation. The loss at the time of the abandonment was and still continues total." It appears to me that this case leaves the law on the subject of abandonment exactly where Goss v. Withers, Hamilton v. Mendes, and Mills v. Fletcher, had placed it.

These, I believe, are all the material cases which are to be found, bearing on the point before the court. I have forborne to touch on any, which exclusively applied to cargo, being of opinion with Chief Justice Tilghman, that there is a great difference between an insurance on ship and on cargo, and that some confusion has been introduced from blending them. The cases which have been reviewed, do, as I think, authorize the conclusion, that the question of the right of abandonment of the ship is to be judged of by all the circumstances of each particular case; and that no such general rule has as yet been established, as that the injury to the ship by the perils insured against, must in all cases exceed one half her value, to justify an abandonment. At all events, I think I may say, that there is no English case, in which, under circumstances like the present, an abandonment of the ship has been adjudged void.

I do not think it necessary to comment at large on all the American cases cited at the bar; but shall content myself with a reference to a few, which have been supposed most strongly in point. The fair conclusion from Fontaine v. Phœnix Ins. Co., 11 Johns. 293 (see, also, Bell v. Nixon, 1 Holt, N. P. 423), seems to me to be, that which the reporter has drawn, that if a vessel, after being stranded, should be deemed a wreck, or her situation desperate, it will justify an abandonment, though she should be got off by other persons, and repaired for a sum less than half her value. And the circumstances of that case bear a very strong resemblance to that now before the court. The case of Goold v. Shaw, 1 Johns. Cas. 293, turned upon the point, that the ship could have been repaired for less than half her value, and might have performed her voyage, which was broken up merely on account of the deterioration of the cargo. It stands therefore on the same ground as Alexander v. Baltimore Ins. Co., 4 Cranch [8 U. S.] 370. But the case which has been pressed with the most earnestness upon the court, as decisive of the merits of this, is Wood v. Lincoln & K. Ins. Co., 6 Mass. 479. The opinion there delivered by the late learned chief justice, is certainly entitled to great weight and consideration, from the elaborate manner in which the subject is discussed. I have not the slightest inclination to doubt the authority of that case, upon its own particular circumstances. At the time of the abandonment there does not appear to have been any serious injury to the vessel; she was merely upset, and at high water was nearly covered; and it was not until after the abandonment, that she was disengaged from the rock and sunk in deep water. She was afterwards weighed and carried to her home port of destination, which was only five miles distant. The learned judge himself, in commenting on the circumstances, observed, "that it was not stated, that she received any essential injury by this accident, or that an attempt to weigh her, and prepare for finishing her voyage, would have been hazardous, or very expensive." In the present case, on the contrary, the vessel was essentially injured, and in a very perilous situation; and the repairs must be very expensive, and of such a nature too, that they could not be completed under a long period of time, as long as the usual period of the whole voyage insured. The learned judge also laid stress upon the circumstance, that the vessel at the time of the abandonment was stranded, but not sunk in deep water. He

added. that it did "not appear that the plaintiff made any attempt to weigh the vessel, or offered the defendants to make any, if assured of the reimbursement of his expenses." That also did not occur in the present case, because the vessel was thought in a desperate state, nor was it requested or offered on the other side. No objection was made to the abandonment, and so far from a desire being manifested at that time to have the insured undertake to get the vessel off, the underwriters declined the further agency of one of the owners, and appointed their own agent, under the supposition that the case, if not hopeless, at least was extremely hazardous. Agreeing then, as I do, to the authority of the decision in Wood v. Lincoln & K. Ins. Co., I may be permitted to say, that the material facts are unlike those of the present case; and that the court in that case, rely in their judgment upon the non-existence of circumstances, which cogently press upon us in this. Having said thus much upon the merits of that decision, I hope it will not be deemed a want of due reverence and respect, to declare, that although in much of the reasoning, (which is indeed drawn from obvious sources) I entirely concur, there are dicta in that opinion to which in the large sense in which I understood them, I cannot yield my assent, and to which I am sure, if the points had been directly in judgment, the learned judge would have given a more exact consideration. It is not however my intention now to comment on these dicta. It is stated in the opinion, that if the vessel be injured by the stranding beyond a moiety of her value, or if the stranding be at such a season of the year that the ship cannot be got off in a reasonable time and repaired, so that her voyage is defeated, the owner may abandon. But language is afterwards used, from which it has been inferred, that even in such cases, if the underwriters offer to bear all the expenses, whatever may be the event, and a fortiori, if they themselves undertake to get off the vessel, and repair her in a reasonable time, at their own expense, and are successful in their purpose, the owner cannot abandon. If this be the proper meaning of the passages referred to, I should pause upon the law thus asserted. But if the meaning be, that in a doubtful case, where the expense of repairs must be great, though not with certainty one-half; or where by the stranding and delay consequent thereon, the voyage may be, but not in all probability must be, lost; if the underwriters offer to bear all the expenses of the experiment, the owner cannot abandon, there seems much reason for admitting such an offer as a material ingredient, in considering whether the owner has a right to abandon. In this view it would comport with the doctrine, as I comprehend it, in the English authorities; for there the absence of such an offer is relied on as auxiliary to the other circumstances, to show that the owner in a doubtful case is entitled to abandon. But the offer itself has never been relied on, to defeat an indisputably vested right of abandonment. See Hamilton v. Mendes, 2 Burrows, 1198; Milles v. Fletcher, Doug. 231; Da Costa v. Newnham, 2 Term R. 407. There is the more reason in our law for adhering strictly to the doctrine, because the right of abandonment must depend upon the facts. and the judgment upon those facts, at the time when it is made. It cannot remain in suspense, or be divested by subsequent events. If the facts then present a case of extreme hazard, and of probable expenses exceeding half the value of the ship, the party may abandon, although in the event, it turn out that the ship is gotten off at a less expense. Fontaine v. Phœnix Ins. Co., 11 Johns. 293; Robertson v. Caruthers, 2 Starkie, 571. I take the language of Lord Ellenborough, in Anderson v. Wallis, 2 Maule & S. 240, 248, to convey the correct notion of the law on this subject. An absolute total loss is not necessary to justify an abandonment. It is sufficient, if at the time it be in the highest degree probable, to sound judgments acting upon all the facts. And it is indeed most manifest, that the case of Wood v. Lincoln & K. Ins. Co., did itself proceed, not upon any single fact, as decisive one way or the other, but upon all the circumstances taken in combination. The whole reasoning too of courts of law, in all the cases where it has been decided that an abandonment must be made in a reasonable time after knowledge of the loss, and what that reasonable time is, demonstrates in the fullest manner the opinion, that the assured is to act, not upon certainties but on probabilities, and that if he should wait until an unfavorable result, he will not then be entitled to turn the loss into a technical total loss. Marsh. Ins. bk. 1, c. 13, § 2, p. 589; Park. c. 9, p. 239.

The case of Hart v. Delaware Ins. Co. [Case No. 6,150]. cited in Marsh. Ins. (Condy's Ed.) 281b, 562, has been supposed to indicate a rule on this subject more broad than that which appears to me ever to have been entertained in the British courts. If the case be correctly reported, the court on that occasion is supposed to have held, that the insured had a right to abandon the ship, if the injury exceeded one half of her value, unless the underwriters offered at all events to pay the amount of repairs; and if they did, then the abandonment would not be good. This doctrine, at least to me, is new. On what authorities it rests, I have not been able to learn, from the short note in Mr. Condy's edition of Marshall on Insurance. If it rests on Hamilton v. Mendes, Milles v. Fletcher, or Da Costa v. Newnham, with the highest possible deference for my learned brother, Mr. Justice Washington, I am not able there to find a warrant for it. The point is not directly before the court, as it was a policy on freight. It does not appear that the ship was abandoned. and if the underwriters offered to repair her, and she might have gone upon the voyage, the loss of freight was by the volun-

tary act of the owner, and not from the perils insured against. The case of Ritchie v. United States Ins. Co., 5 Serg. & R. 501, proceeded upon the authority of that of Hart v. Delaware Ins. Co., and may well be supported upon other distinct grounds.

I know of no judgment where it has been held, that in a case of capture, embargo, or blockade, the right of the insured to abandon, can be intercepted by an offer of the underwriters to indemnify and pay all the expenses. And indeed, if it could be by such an offer, then an abandonment in all such cases would be perfectly nugatory, for the policy always imports on the part of the underwriters an agreement to this effect. And yet, if the principle be correct, I do not perceive why it is not equally as applicable to a case of capture as of sea damage, to a case of blockade as of shipwreck. It is said indeed, that the contract of insurance is a contract of indemnity only; and therefore if the underwriters will bear all the expenses there is no ground to claim more, and if all the expenses are paid, the insured is completely indemnified. This is true in a general sense, sub modo, but not universally. The insured by the same law has a right of abandonment, and this right is the result of the construction of the same contract, which is called an indemnity. If the insured abandon for a just cause, he is entitled to recover for a total loss, and that is deemed by the law his just indemnity; and he is not obliged to take the remnants and surplusses of a lost voyage or adventure, and claim of the underwriters merely the average or expenses incurred by the calamity. The cases are familiar in the books, where the insured has successfully insisted upon his right to a total loss, notwithstanding an offer of payment of all charges incurred. The difference may be and often is, very material to the insured, whether he is obliged to take the property upon the payment of damages and expenses, or to abandon it and recover for a total loss. As I understand the law, it has given to him, and not to the underwriters, the option to abandon or not; and if he does abandon in a proper case, he may stand upon his rights uncontrolled and uncontrollable by the other party. It appears to me, meaning to speak with all deference for other judgments, to be introducing a new element of discord into the law of insurance, to allow the right of abandonment to be a shifting right, dependent upon the will of both of the parties, and to be defeated by any act of one, after it has rightfully attached by the act of the other. And I am yet to learn how it is, that an offer made at the time of abandonment to pay all expenses, can have more efficacy than the same offer, incorporated as it is, in the original terms of the policy. The insured is in no case bound to abandon. He may in all cases elect to repair the damage at the expense of the underwriter; and if he acts bonâ fide and with reasonable discretion, there is no

decision yet pronounced, which declares that he shall not be entitled to a full compensation, however great it may be, even if it should equal, or even exceed, the original value of the ship. And until such a decision is made, the direct terms of the policy seem strong enough to justify such a claim. But if the doctrine be otherwise, which I cannot admit, still it does not apply to the present case. Here, no request was made to the owners to repair the ship, and no offer to bear all the expenses, whatever might be the event. It is true, that a week after the abandonment, when the ship was off the rocks and lying at the wharf in Portsmouth, such a request and offer were made. But that was clearly too late. If an offer is to have any effect, it must be made at the time of the abandonment, with reference to the state of facts then existing. The underwriter cannot lie by and profit by the event. He must decide recenti facto upon the notice and application to abandon; and if he does not then make the offer, he waives all right of benefit from it. In the present case, it cannot be denied that there was the most ample time for deliberation, and as early as Thursday morning the most ample knowledge of all the facts, by the underwriters, through their own special agent. Even if it were possible to contend, that the right might be in suspense up to this period, any subsequent delay was unreasonable and unjustifiable.

The American cases then may be dismissed without farther commentary, since they furnish no new rule on the subject of abandonment; at least none which applies to circumstances like those of the case at bar. We are therefore driven back upon general principles, and must extract them, as we may, from the current of authorities, to aid us in the present inquiry. The right of abandonment has been admitted to exist, where there is a forcible dispossession or ouster of the owner of the ship, as in cases of capture; where there is a moral restraint or detention, which deprives the owner of the free use of the ship, as in case of embargoes, blockades, and arrests by sovereign authority; where there is a present total loss of the physical possession and use of the ship, as in case of submersion; where there is a total loss of the ship for the voyage, as in case of shipwreck, so that the ship cannot be repaired for the voyage in the port, where the disaster happens; and, lastly, where the injury is so extensive, that by reason of it the ship is useless, and yet the necessary repairs would exceed her present value. None of these cases will, I imagine, be disputed. If there be any general principle, that pervades and governs them, it seems to be this, that the right to abandon exists, whenever from the circumstances of the case, the ship, for all the useful purposes of a ship for the voyage, is, for the present, gone from the control of the owner, and the time when she

will be restored to him in a state to resume the voyage is uncertain, or unreasonably distant, or the risk and expense are disproportioned to the expected benefit and objects of the voyage. In such a case, the law deems the ship, though having a physical existence, as ceasing to exist for purposes of utility, and therefore subjects her to be treated as lost. See the opinion of the court in Rhinelander v. Insurance Co. of Pennsylvania, 4 Cranch [8 U. S.] 41; Marshall v. Delaware Ins. Co., 4 Cranch [8 U. S.] 207. Try the Argonaut by the test of such a rule, and it is not difficult to come to the conclusion, that the plaintiffs had a good cause of abandonment.

But if this rule, or the application of it, should be deemed doubtful; still I have the right to stand upon the ground, which every other judge has assumed and acted on, and decide this case upon its own circumstances. There is no case, as has been already sufficiently shown, which in terms or in effect decides the present. Each has been decided upon its own peculiar circumstances, and by reference to the analogies of the law. I am not for extending the right of abandonment beyond the principles already settled; neither, on the other hand, am I for shutting out from the benefit of those principles new cases, simply because they do not go quatuor pedibus with former cases. New cases, as they arise, must be settled, as Goss v. Withers and Milles v. Fletcher were settled before our time, by general reasoning applied to the nature of the contract, and the general convenience and policy of the commercial world. We are not to stand upon the niceties of special pleading, or the exact weight of every one of the ingredients. There must be, or there never will be an end of litigation, some broad line of distinction to govern us. I have deliberated with as much patience and caution, as I am able, upon the present case; and under all its circumstances, I cannot resist the conclusion, that, at the time, they fully justified the abandonment; and the abandonment, once well made, was forever conclusive upon the parties. Let me again enumerate these circumstances. The ship was stranded, and bilged, and sunk, in an exposed situation upon a ledge of rocks, and in imminent danger. Her cargo was unavoidably discharged for safety, and forever separated from her. Her sails and rigging were cut away, with a view to the pressing necessity of saving them. The master and crew had deserted her as helpless and hopeless. The voyage must be suspended for a long time, as long as the voyage insured. The expenses of attempting to get off the ship must in every event be considerable, and might be very heavy. The chance of success was exceedingly doubtful, and dependent upon the most uncertain of all things, the winds and weather, in a proverbially variable season of the year. The reparation of the actual injuries was, in the most favorable view, so expensive, that it was not expected to cost much less than half the value of the ship; and these injuries were necessarily liable to augmentation from every delay and unfavourable change of weather. I do not say, that all these circumstances are necessary to constitute a case for abandonment. They are of various import and cogency. But as they exist in the case, I use them in combination, to show, that the voyage with that ship was not worth farther pursuit, the expenses being very high, the dangers imminent, the benefit uncertain, and the present value of the ship estimated by competent judges little more than the value of her materials. To use the strong language of Lord Ellenborough, already cited (Davy v. Milford, 15 East, 559, 564), the ship at the time "had ceased to exist for any useful purpose," as much so, as if there had been a total submersion; and a total loss was "in the highest degree probable" (Anderson v. Wallis, 2 Maule & S. 240, 248). I think too, that the delay of the voyage, though inevitable from the accident, was in itself unreasonable with reference to the nature and objects of such a voyage, and the right of the owner to the present beneficial use of his property. I adopt the reasoning of Chief Justice Marshall, in Rhinelander v. Insurance Co. of Pennsylvania, 4 Cranch [8 U. S.] 29, 45. See, also, Marshall v. Delaware Ins. Co., 4 Cranch [8 U. S.] 207. "There are," says he, "situations, in which the delay of the voyage, the deprivation of the right to conduct it, produce inconvenience to the insured, for the calculation of which the law affords and can afford no standard. In such cases there is for the time a total loss." And I am unable to persuade myself, that so long as the doctrine prevails, that a ship may exist, and yet in contemplation of law be totally lost, a case of stranding so pregnant with distress, injury, danger, and hopelessness as the present, can be displaced as a case of abandonment. I am much deceived, if some of the cases already quoted are more calamitous or pressing in their circumstances, where learned judicial minds have not hesitated to pronounce for the right of abandonment. Let me add also, that according to my impression of the established law, if the abandonment had not been made at this time, but had been postponed, until the vessel had become a technical wreck, or had been got off at an expense exceeding three-fourths of her value, the plaintiffs could not then have elected to abandon, for they would not have had a right to lie by and specu'ate upon events. The delay to abandon would have been fatal. See Marsh. Ins. bk. 1, c. 13, § 2, p. 589; Martin v. Crokatt, 14 East, 465; Mitchell v. Edie, 1 Term R. 608; Da Costa v. Newnham, 2 Term R. 407. So that the plaintiffs must either have abandoned at the time when they had notice of the loss, or they would have been forever concluded. Surely the law cannot have placed them in such

peril, and yet have deprived them of the only means and the only time in their power of asserting a right, which it yet contemplates as unquestionable at some time pending the calamity. If the present cause stood therefore upon this point alone, as at present advised, I should be unable to extricate myself from the conclusion, that the plaintiffs are entitled to recover for a total loss.

But I may be wrong in this judgment, whatever may be my confidence in its soundness, and I proceed to the next point so fully argued at the bar, and upon which the parties are entitled to my opinion. It is not denied, and if it were, it is so well established by the general current of authority, that it may be considered as a fixed rule, that if the ship be injured by perils insured against, so as to require repairs to the extent of more than half her value, the insured is entitled to abandon as for a total loss. The rule seems to be founded upon this consideration, that a ship so much injured is not worth repair, and therefore she may be abandoned as innavigable, and infected with a fatal infirmity. It was in its origin undoubtedly borrowed from the French law. It is to be found stated in Le Guidon, one of the earliest treatises on Insurance (chapter 7, arts. 1, 9), and is there applied to the case of goods. It is there said, that the merchant may abandon, where there is a shipwreck of the whole or of a part, when there is an average, that exceeds in damage a moiety of the merchandize, when there is a capture by friends or enemies, an arrest of princes, or other like disturbances in the voyage, or such deterioration of the merchandize that it cannot be carried to the place of destination, or it is only worth the freight or a little more. While I agree, however, with Mr. Justice Lawrence (Parsons v. Scott, 2 Taunt. 363, 372), that the passage is in terms applied to goods only, I cannot admit, that it is restrained to them, or is not in sense and reason equally applicable to the ship. And in point of fact we all know, that it has been applied in the common law authorities indifferently to each (Goss v. Withers, 2 Burrows, 683; Park. Ins. (6th Ed.) c. 9, p. 194; Condy, Marsh. Ins. c. 13, § 1, pp. 568, 571; Hamilton v. Mendes, 2 Burrows, 1198; Gardiner v. Smith, 1 Johns. Cas. 141; Vandenheuvel v. United Ins. Co., 1 Johns. 406; Abbott v. Broome, 1 Caines, 292; Hart v. Delaware Ins. Co. [Case No. 6,150]; Condy, Marsh. Ins. 281, note, 562, note; Peters v. Phœnix Ins. Co., 3 Serg. & R. 25; Ralston v. Union Ins. Co., 4 Bin. 386; Patrick v. Commercial Ins. Co., 11 Johns. 9–14; Wood v. Lincoln & K. Ins. Co., 6 Mass. 479; Coolidge v. Gloucester Mar. Ins. Co., 15 Mass. 341; Weskett, tit. "Abandonment," § 23). Valin has recognised the rule itself in the most emphatic manner, and it was probably his authority, that gave it a decisive currency in our jurisprudence. The French ordinance (article 46) having among other things declared, that abandonment

should be lawful in case of a total loss of the effects (perte entière des effets assurés), Valin in his Commentary does not hesitate to adopt the doctrine of Le Guidon, and to declare it is a total loss of the effects within the article, when the damage exceeds the moiety of their value. 2 Valin, Comm. lib. 3, tit. 6, des Assur. art. 46, p. 101. Emerigon (2 Emerig. c. 17, § 2, p. 176, etc.) has found great difficulty in reconciling this doctrine with the strong terms of the article; but it stands commended by the sober judgment of Pothier (Poth. Assur. note 118). I dwell upon the origin of the rule the more freely, because in the exposition and application of it, this circumstance may not be inconsequential. It might seem at first view, that the rule being agreed, nothing would remain on this point, but to inquire into the fact, whether the repairs and expenses are a moiety of the value of the Argonaut. But we are here met with two difficulties on points of law, which it is singular, considering the antiquity of the rule, should not have been long since definitively adjudged, as it is impossible that they should not often have arisen. The first difficulty is, as to the mode of ascertaining the value of the ship. The second is, as to the mode of ascertaining the quantum of expense or injury. Is it to be the actual cost of the repairs, or the actual cost, deducting one-third new for old? In other words, is it the supposed damage to the ship estimated in the ordinary way, or by the actual loss on cost to the owner.

Upon the first point, it is contended by the defendant's counsel, that the valuation in the policy is conclusive, and affords the only just means of ascertaining the value, it being as between the parties the agreed value of the ship. The plaintiffs deny this doctrine, and insist upon the actual value at the time of the loss, as the true value. Nothing is more familiar, or more clearly settled, than the doctrine, that the valuation in the policy is conclusive in case of a total loss; but it is inapplicable for the purpose of ascertaining the quantum of injury (for it is quite another question as to the quantum of payment to be made by the underwriters) in case of a partial loss of goods. When the policy is on goods, the invariable rule is, to ascertain the quantum of injury by the difference between the price of the sound and damaged goods; and the reasons of the rule have been expounded with so much force and accuracy, that it would be a waste of time to repeat them. Johnson v. Sheddon, 2 East, 581; Marsh. Ins. c. 14, § 2. In what respect does the case of the ship differ from the case of the goods, as to the ascertainment of the damage? Can the valuation in the policy be a more correct guide in the one case than in the other? The question in each case is necessarily the same; what is the present value of the property, compared with its value before the injury, and the purpose is the same, to fix the extent of damage sustained by the

accident. One should suppose, that this was the true measure of the damage in all cases, in which it is attainable. The valuation in the policy at the commencement of the voyage cannot in the case of the ship, any more than of the goods, accurately measure the proportion of the damage, because the value may in the mean time have essentially changed; and yet it is that proportion, which is the object of inquiry. It is true, that there is much greater facility in applying the rule to goods than to a ship, because the sale of sound goods of the same quality is so frequent, that the deterioration of the damaged goods is readily ascertained by a like sale. But a sale of the ship is not only difficult in most cases, but would defeat the very object of the voyage, and the comparison cannot be made with other sound ships, but must be derived from a conjectural valuation of the same ship in her sound state. These are important differences, but they do not impair the correctness of the principle. They prove, not that the value at the time of the accident is a wrong basis, but that the value must be ascertained in some other manner, than by a sale. Consider what is the real object of the valuation. It is to decide, if the ship be worth repair. The law deems her worth repair, unless injured more than half her value. At what time? Surely at the time of the injury, and not at the commencement of the voyage; for to that period only can the question of worthiness of repair apply. If the policy were an open policy, there would be no pretense to look to the value at the commencement of the voyage, for it might be according to events a third greater or less than at the time of the stranding; and thus the right of abandonment might depend, not upon the proportion of present value, but upon the value at a former period. The ship might be damaged three-quarters of her present value, and yet an abandonment would not be good; and on the other hand, she might be damaged only one-third of her present value, and yet it would be good. It does not strike me, that such a state of things is consistent with the true meaning of the rule as to the half value. Then, as to the bearing of the authorities on this subject; I have looked into all the cases, and I cannot find an instance, in which the doctrine as to the half value of the ship is referred to any other period of the voyage, than that of the happening of the calamity, or the subsequent arrival in port. In short, to the very time, when the question arises of reparable or not. The very point arose in Fontaine v. Phœnix Ins. Co., 11 Johns. 293, and the learned Chief Justice Kent ruled at the trial, that the value at the port, where the injury happened, and not the valuation in the policy, was to be taken in applying the doctrine now under consideration. A new trial was ultimately granted upon another point; but the inclination of the court manifestly upon this point was, that the ruling of the chief justice was right. In the absence of all contradictory authority, the decision of his luminous and accurate mind would go very far to satisfy mine, even if I entertained, which I certainly do not, any doubt on the subject. The foreign writers also, who have treated the subject, appear to me to have proceeded upon the tacit assumption and recognition of the same doctrine in all their reasonings. See, also, Weskett, tit. "Abandonment," § 23, and Coolidge v. Gloucester Ins. Co., 15 Mass. 341.

Then, as to the other point, whether the actual cost of the repairs to the owners, or the cost, deducting one third new for old, is the rule, by which we are to ascertain the quantum of injury or loss. That is a point, upon which a great deal may be said on both sides. The propriety of the allowance of one third new for old, in cases where the ship is not abandoned, or, in other words, in cases of a partial loss, is not contested. That rule itself is somewhat arbitrary, and not founded upon any exact calculation with reference to the particular case. The ship may be almost or entirely new, and then the reason for the deduction would altogether cease. The ship may be very old, and then the reason for a much greater allowance would apply. The general principle, upon which the rule is founded, is as stated by Magens (1 Magens, Ins. 52), that the underwriters ought to pay for the actual damage or injury, but not for the wear of the things lost or injured, and therefore proper allowance ought to be made, for the difference in value between the new and the old. But if this difference were to be ascertained in every particular case by actual inspection and estimates, there would be no end to controversies, and therefore, general usage, which the law follows, as founded on public convenience, has applied a certain rule to all cases, not upon the notion of perfect justice, but as generally reaching, in substantial equity, the mass of them. It is true here, as was well observed by Lord Mansfield on another occasion, that it is of less consequence, how the rule is settled, than that it should be settled. Still the rule is arbitrary, and therefore is to be confined to the cases, where the usage is clear, or to cases, which necessarily fall within their analogies. Does it then enter as an ingredient into the rule of abandonment, where there is a loss of the half value? This is to be ascertained by considering the nature and object of that rule, and the manner, in which it has been interpreted by the authorities. We have already seen, that it had its origin in foreign maritime jurisprudence; and in the terms, in which it is laid down in the ancient treatise in Cleirac's collection (Le Guidon, c. 7, § 1), there is strong reason to think, that it was the actual cost without any deduction, which was in contemplation of the author. The object of the rule is, to ascertain, whether the ship be worth repair, and by a principle somewhat arbitrary, yet as in the former case, justified by general con-

venience, it decides, that if the injury exceeds half the value, she is not worth repair. Now certainly it cannot be pretended, that a deduction of one third new for old would operate equitably, under all, or even ordinary circumstances, upon this rule. That deduction always supposes, that the owner derives a benefit from the repairs; but unless the vessel is in fact worth, after the repairs, twice the amount of the repairs, the deduction does in effect take away the very ground-work of the rule. It throws upon the owner all the loss of the deduction, and gives the underwriter the full benefit of it. Now this, which is the natural operation of the deduction in the case, which has been put, applies with more or less force to all other cases, where the value of the ship is not increased to the full extent of all the costs of the repairs. And this, I presume, rarely occurs; perhaps not one time in ten. It is manifest then, that the deduction must operate with great inequality, and introduce into the rule an element, sometimes of injustice, and generally inconsistent with its professed design. In short, if the deduction is always to be made, the rule, instead of being expressed as one-half, should be in terms three-quarters, of the value of the ship. No such injustice could occur on the other side; because, if the ship were abandoned, it would generally be in the power of the underwriter to decide, whether to repair or not; and if repairs were made, he would receive all the benefit of any increase of value. According to my understanding too of the true sense of the rule, the owner is always affected in the application of it, by any increase of the value of the ship by the repairs, equally with the underwriters. The sense, in which I understand the rule is this—would the ship, if she were repaired, be worth double the amount of the repairs? If so, then there can be no abandonment, for the owner has not suffered an injury to the amount of half her value; if otherwise, then there may be an abandonment. I do not say, that you are to judge of the value after the repairs actually made; for then the right of abandonment might be gone by lapse of time; but you are to judge by the existing circumstances with reference to that value, whether the repairs are now worth making.

In examining the authorities, it is beyond all doubt, that no case in England has ever recognised any such deduction of the one-third, except in cases of a partial loss. In all the cases, where the injury to the half value has been in question, not the slightest allusion is made to any such deduction by court or counsel. Yet some of these cases would seem to have called for some expression in its favour, if it existed. In Cazalet v. St. Barbe, 1 Term R. 187, where the jury found the injury forty-eight per cent. only, there is not the least hint, which could lead us to suppose, that any such deduction was then made. It does not in fact appear, that any repairs had been made in that case, or were contem-

plated. In Da Costa v. Newnham, 2 Term R. 407, the deduction was held not to apply, except where the owner received back his ship, upon the plain ground, that he ought not to pay, where he received no benefit. In Thomson v. Royal Exch. Ins. Co., 1 Maule & S. 30, it is manifest, that Lord Ellenborough could not (as has been already intimated) have contemplated such a deduction. And Mr. Stevens, a gentleman of Lloyd's of considerable experience, in stating the deduction, applies it in terms only to cases of a partial loss. Stev. Av. 159, and see Weskett, Stranding, § 5.

The question, however, has arisen in America. In Dupuy v. United Ins. Co., 3 Johns. Cas. 182, the point was directly in judgment, and indeed formed the turning point of the cause. And it was there held by the unanimous opinion of the supreme court, that the deduction was not to be made, and that it was the actual damage of expenditure, which was contemplated by the rule, without any reference to the distinction of new for old. That decision was subsequently acted upon by the court; and though it was finally overturned by the court of errors (Smith v. Bell, 2 Caines' Cas. 153), it is impossible not to feel, with all due reverence for the latter tribunal, that upon questions of this nature, the learning and experience, and distinguished talents of the supreme court of New York, entitle their judgment to very great consideration. I have examined the reasons given by the court of errors for the reversal, and I am compelled to say, that they do not convince my judgment. Ego assentior scævolæ. The case of Coolidge v. Gloucester Ins. Co., 15 Mass. 341, appears to me to have contemplated the rule in the same light. It is there said by the court, that to all legal purposes, after the constructive total loss, the ship, repaired and rebuilt at an expense exceeding half her value, must be considered as a new ship. And I take occasion to add, that if in that case the deduction of one third had been made, and the valuation in the policy had been taken, there would not have remained an expense of one half the value of the ship to justify an abandonment. My judgment upon the whole is, that the deduction of the one third cannot be legally made in cases of this nature. If indeed it could be made, I should have no doubt, that the like deduction must be taken from the whole value of the ship after the repairs, in order to bring her down to the standard of value existing at the time of the stranding.

There are some minor points connected with this general topic, which may as well be disposed of in this connexion. The first is, whether the repairs of rigging, etc., injured by wear and tear, and of decaying wood, is to be deducted from the gross amount of the expenditure. I am to take it for true, from the whole of the argument, that no repairs have been made, which were not necessary to place the ship in her former predicament; and that the item of $372.22, now in controversy,

was indispensable in the accomplishment of this object. If so, it is not to be deducted, for it was a necessary expense, and falls within the reasoning already stated. The point was expressly ruled in Depeyster v. Columbian Ins. Co., 2 Caines, 85, under much stronger circumstances. Another point is, whether an expenditure incurred at the time with a view of getting off the ship, but which became ultimately unnecessary, from the success of another experiment, is to be considered as part of the gross expense. I allude to the charges and loss connected with the purchase of casks. It appears to me, that this forms a part of the gross expense. It might as well be argued, that if two thousand dollars had been expended in trying other experiments apparently most judicious, and yet they had not succeeded, they were not to be included. One of the very grounds of abandonment in cases of this nature is, the certainty of heavy expenses beyond half the value of the ship, and the utter uncertainty, whether they will be successful. If the underwriter will insist, that the question of expense is to be judged of by the event, and not by the highest probability at the time of abandonment (a point upon which I wish to reserve my opinion, until better advised,) he must stand to the rigour of his rule, and is not at liberty to claim, that the owner would have been wiser than himself, or that an expense, apparently judicious, was wholly unnecessary. The question never can be, in any case of this nature, whether the expense incurred accomplished a real benefit, but whether it was reasonable and proper. Suppose the ship had been got off by means of the casks, could it be contended, that the expense of stopping the holes in the bottom was to be deducted, because it turned out unproductive? Then again it is urged by the plaintiffs, that the repairs have not been sufficiently made, and that they are entitled to have the ship restored to them in as good a condition as before the stranding. And this is doubtless true in point of law. But it cannot escape observation, that if there be any deficiency in this respect, no blame can justly attach to the underwriters. They offered to have the repairs made under the direction of the owners, and upon their declining, they employed a skilful and competent agent. Under such circumstances, the court, though bound to give the parties the full benefit of the principles of law, would be disposed to look with some indulgence upon slight and unimportant deficiencies.

The principal defects relied on at the bar, are the substitution of maple in the keel, for the original oak; the increase of the number of pieces of the keel, from three to five, and the inartificial structure of the keel, by placing the scarf in the middle immediately under the scarf of the keelson; the omission to salt the ship after the repairs, she having been originally salted; the omission to take off the plank, and make a thorough examination of the ship, to ascertain all the places in which she was strained, by lying on the rocks; the making new butts, by placing short plank instead of whole, in the bottom; the leaving the ship with a continual unknown leak, after the repairs were completed. It is not to be supposed, that the court can of itself undertake to judge of the extent and importance of these supposed defects and omissions. That duty may more properly be performed by experts, as I have already intimated. And if either party shall request it, as material to the ultimate decision, there will be no difficulty in granting a suitable commission. Upon one or two suggestions thrown out at the bar, it is however my duty to comment. It is said, that the plaintiffs had a right to have the repairs made of the same materials as the original, and therefore that the underwriters could not substitute maple for oak in the keel. In short, that if the keel had been of mahogany, the plaintiffs would have had a right to a new keel of the same wood. Certainly the owner is entitled to have his ship made as nearly as practicable, as good as she was before the accident, or to receive an equivalent compensation. But if the ship is made substantially as good, and if the substitution of other materials is not from choice, but necessity; it would be going great lengths to assert, that this was not a compliance with the law. Suppose a ship, built of teak wood in the East Indies, were to meet with an accident on our coast, and require repairs, would it be contended, that the underwriters must send to the East Indies for teak wood, or pay the expense, if other materials equally solid and useful could be found here? I incline to think not. The true principle is, that the underwriter shall pay the owner such a compensation as shall make the ship substantially as good as before; or in other words, that he shall lose nothing by the peril. Matters of taste, fancy, or peculiar choice, can scarcely admit of appreciation in money, and the law can rarely reach them. It appears to me, that the plaintiffs were entitled to have had the reparation of the keel with oak, if it could be reasonably obtained. And the weight of evidence decidedly is, that the increase of the number of pieces of the keel, and the placing of the scarfs, made a material difference in the strength of the ship. Judging from that evidence alone, I should draw the conclusion, that the ship was in these respects imperfectly and inartificially repaired. But skilful artisans are far more competent judges, and to them I should cheerfully resign my own opinions. What would be the posture of the cause upon the point, as to the injury to the half value of the ship, under the views already suggested, I am not at this moment quite prepared to declare. I incline to believe, however, that taking the value of the ship at $11,000, or even $12,000, it will be found, that the repairs will exceed, by a small excess, one half of the value of the

ship. It will not however be difficult for the parties to place this matter beyond doubt. And I gladly escape from this minuteness of detail, to the last great point in the cause, which, if well founded, supersedes all the others.

And this point is, whether there was an acceptance of the abandonment. This is partly a question of fact, and partly of law. In considering this question, I understand myself, by the assent of the parties, to be at perfect liberty to deal with the subject in the same manner as if the controversies were between private persons. No question is made about the powers, rights, or modes of acting, of the corporations before the court, or as to the sufficiency of the authority, under which their presidents or other agents acted in the premises. Their acts are to bind, just as far as they might lawfully bind, if done under the fullest authority. There can be no doubt, that the acceptance of an abandonment need not be in any particular form, or by express words. It may be, and often is, inferred from circumstances; and I think it may be laid down, as a general proposition, that whenever the underwriter does any act in consequence of an abandonment, which can be justified only under a right derived from it, that act is of itself decisive evidence of an acceptance; and cases may even be put where the act of the underwriter will in law prevail over his express declarations. As if, after an abandonment, he should proceed to sell the vessel, with an express protest against the acceptance, and a declaration, that he did it for the benefit of the owner, his act would nevertheless conclusively bind him in point of law. This, to be sure, is a very strong case, but it is not the only case; and I put it to show, that it is a mistake (commonly entertained) to suppose, that declarations can overrule the legal operation of acts in reference to an abandonment.

In the present case, there is no pretence to say, that the underwriters have made any express declaration of acceptance. It is inferred by the plaintiffs from the silence of the underwriters at the time of the abandonment and their neglect to signify the contrary within a reasonable time. It appears to me however, that this inference cannot be supported. The underwriter is not bound to signify his acceptance within a reasonable time; nor can his silence, per se, be proof of his acceptance. If he says nothing, and does nothing, the proper conclusion is, that he does not mean to accept. And this conclusion, so reasonable in ordinary cases, applies with still more force to corporations, because from their mode of doing business, deliberation of the board of directors is usually required; and silence in such a case is certainly less significant, than it might otherwise be presumed to be. If the case had stopped here, it would not have presented any difficulty. But the acts of the underwriters are also relied on, as conclusive of their acceptance. Im-

mediately after the abandonment, the underwriters declined the farther agency of the owners; they appointed their own agent with authority to sell the ship if he thought fit, and with authority to get her off if he deemed it practicable. From this moment the underwriters took the sole possession and management of the ship. She was got off at their expense, and by their agents, and was subsequently repaired, and now remains under their care and custody. Do these acts, or any of them. amount to an acceptance of the abandonment? If they would do so ordinarily, can the secret intentions of the underwriters, not to accept, if the event should be favorable, or a mistake of law as to their rights, vary the legal conclusion? That these acts done by the underwriters were done under the full belief, that the case, if not utterly desperate, was nearly so; that the facts, which were truly represented to them, were so deeply marked with calamity, that a total loss seemed almost inevitable; and that scarcely the faintest hope was entertained of changing it into a partial loss, unless by most unexpected good fortune, cannot be reasonably doubted. The very instructions to Mr. Blake, and indeed the whole conduct of the underwriters, demonstrate it. It is as clear that the underwriters did contemplate that the abandonment clothed them with some new rights, for in their letter and memorandum to Mr. Blake, they expressly distinguished between their rights over the ship, which was abandoned, and over the cargo, which was not abandoned. They might be wrong in this conclusion, and certainly they are not bound by a misconstruction of the law, if it could be otherwise for their benefit. On the other hand, it is clear, that the underwriters by the intimation in the memorandum, "that if the loss should prove to be less than fifty per cent. on the ship, the abandonment will not take effect," did suppose, that they might act upon the abandonment, and if in the event there was not a total loss, they were not bound by their acts to an acceptance. If this also was founded in a mistake of the law, the plaintiffs are entitled to the full benefit of the law, as it stands. It is however matter of observation, that this memorandum was never communicated to the owners, and therefore they could only act upon the fact, that their own agency was not required, but an agent was appointed by the underwriters; and no intimation was given that the underwriters meant to resist the abandonment.

The question then turns upon this, whether the underwriters, as such, had a right to do these acts without the assent of the owners, or derived their authority virtually from the abandonment. If the latter, then, as they cannot accept in part, and refuse in part, they are bound in the whole, and accepting the abandonment for one purpose is an acceptance of it for all purposes. They cannot treat it at one moment as a transfer

of the property, and in the next, upon some new occurrence, as utterly void. An acceptance once made, can never be recalled. It is said, that the appointment of an agent was not an acceptance of the abandonment. Certainly the mere appointment of an agent must be admitted not to conduce to such an effect. And even the additional fact, that he was clothed with unlimited and absolute power over the property, might not in all cases be conclusive, if he never acted upon such authority. But if he is clothed with absolute authority to sell the property, does it not show, that the underwriters contemplated the property as their own; and how can it be theirs, unless in virtue of the acceptance of the abandonment? And under such circumstances, is it not the strongest evidence of an antecedent virtual acceptance? An agent may be appointed merely to consult with and aid the owners, or to watch the progress of events, or to prevent frauds; and if he acts within such authority, his acts do not imply an acceptance. But this is very different from a general and unlimited agency; and still more so, when acts are done of exclusive dominion, control, and management of the ship. The case of Griswold v. New York Ins. Co., 1 Johns. 205, does not support the doctrine for which it was cited. There the policy was on freight, the assistance was given in saving ship and cargo, at the request of the owners, before the abandonment, and no exclusive possession or management was taken after the abandonment. In Wood v. Lincoln & K. Ins. Co., 6 Mass. 479, 484, the point was not made, nor is there a dictum in that case which refers to it. The remarks, as to the effect of an undertaking by the underwriter to repair, are addressed to the question of a right of an abandonment, not of an acceptance of an abandonment. It is not there said, that the underwriter has a right to repair against the will of the owner; but that his offer to repair will, under certain circumstances, defeat the abandonment.

The question then comes to this, whether the underwriter has a right, in case of stranding, without the consent of the owners, to take the exclusive possession and management of the ship, and afterwards to retain and repair the ship on account of the owners. If he has not, then the exercise of such a right can stand only upon the acceptance of the abandonment as a transfer of property; and if so, the case falls within the principle already stated. It has been supposed, that the cases of Hart v. Delaware Ins. Co. [Case No. 6,150] Condy, Marsh. Ins. 281, a, and 562, a, note, and Ritchie v. United States Ins. Co., 5 Serg. & R. 501, 509, recognise the general right of the underwriter, independent of an abandonment. No such point however, was made in either case; and the true explanation of them is that, which has been already given of the

case in 6 Mass. 479. I must confess, that this is the very first time, that I ever heard of any right of an underwriter, as such, to intermeddle with the property insured. There is not a dictum in any book, which admits him to possess any ownership in the ship, or gives him any right or control over it. It has been very justly observed even in relation to repairs on account of perils insured against, his engagement is solvere, not facere, to pay the amount, and not to do the work. If the underwriter has a right to repair in one case, he has in all cases, and in his own manner, and with his own materials. Has the law ever contemplated, that he can take the possession of the ship, and decide for the owner what shall be done with her? Suppose in this very case, there had not been any abandonment, would the owners have been bound to suffer the ship to be repaired? I think the law, beyond all doubt, is otherwise; and the pretension now set up, in behalf of the underwriters, is truly alarming. The owners, if there had been no abandonment, would have had a right to claim remuneration in money for the injury sustained. They might have thought the ship not worth repairing; and if they did so, they had a right to break her up, and to claim from the underwriters an indemnity in money for the actual loss by the stranding. It would have been no answer on the part of the underwriters, that they were willing to repair the ship, or that the owners ought to repair her. It is true, that the actual cost of repairs is the best test of the actual injury, but the law does not insist on this. It gives the option to the owners, to take the reasonable estimated amount of loss, or the actual expenditure in repairs, with the usual deduction. Consider, for a moment, what would be the mischiefs and embarrassments attending this novel doctrine. At whose risk would the ship be, during the period of repairs? Could the owner sell her, so as to oust the right of the underwriter to repair, or must he sell her cum onere? If he did sell, the repairs might be just what the purchaser would choose to dispense with. Suppose an attachment on the property; in what manner are the conflicting rights to be settled? The ship in her damaged state might be well enough for all the purposes of the owner. Shall he then be compelled to give her a more complete repair? In short, does not the doctrine necessarily lead to consequences most injurious to the owner, laying open new scenes for doubt, strife, and litigation? For me it is sufficient, that no such doctrine has ever received the countenance of a court of justice; and if it should, the occurrence, looking to the present state of the law, would greatly surprise me. If, when a ship is abandoned, the underwriters do not choose to accept it, they have a right to lay by and wait the event. They are to act in this, as in all other cases, according to their

sound discretion. If the owners have abandoned without just cause, the underwriters are not prejudiced by leaving the ship as she is. If for just cause, then they are called upon at the time to act for their own interest. Cases of hardship may occur on one side or the other, and the property may, as I fear it will in the present case, perish in the contest. But this is not the fault of the law, but of the honest differences of opinion incident to all human transactions. If after abandonment, the owners were to proceed to repair the ship without consultation with the underwriters, it would be a waiver of the abandonment, because it would be doing an act inconsistent with the asserted transfer of ownership. It would deprive the underwriters of the right of electing whether to repair the ship or not, and thus compel them to spend their money in a way which they might deem useless. The same principles must govern, when the like acts are done by the underwriters after abandonment; for unless they are to be deemed subrogated owners, they would equally trench upon the rights of the original owner. What is the ground, upon which an abandonment is required to be made within a reasonable time? Lord Kenyon said, it was "to put the underwriters in a situation to do what was necessary for the preservation of the property, whether sold or unsold" (Allwood v. Henchell, Park, Ins. (6th Ed.) c. 9, pp. 239, 240; Condy, Marsh. Ins. bk. 1. c. 13, § 2, pp. 593, 594); which plainly supposes, that no such right previously existed. Lord Ellenborough, in Martin v. Crokatt, 14 East, 465, 467, uses language to the same effect. He asserts, that where expenses are necessary for repairs, and the owner chooses to make it a total loss, he "ought to give notice of abandonment, to enable the underwriters to elect whether they will or will not incur such expenses." How can this be, if the underwriters have a right to repair without an abandonment? Even the foreign jurists, standing upon the positive texts of their own ordinances, do not appear to me to contemplate such an exercise of authority over the ship, as this. 2 Valin, Comm. lib. 3, tit. 6, art. 51; 2 Emerig. 196. It appears to me, that the underwriters struggle in the present case against what I cannot but consider a stubborn principle of law. They claim to do an act, as underwriters, which they can only do as owners. They claim the right to suspend the acceptance of the abandonment by intentions against acts. They elect to act under the abandonment, disclaiming, at the same time, to accept it. They assume the possession of the ship in virtue of the transfer, with the belief, that they can still return her to the owners, if in the event that shall be most for their interest. The law has entrusted them with no such authority. They have acted, as I doubt not, from the best motives; but I cannot help thinking that they have mistaken the law, and that their acts, done, lawfully, solely in virtue of the acceptance of the abandonment, cannot now be construed as disjoined from the abandonment. I have already said, that the offer to return the ship, after the ship was off, was too late. My deliberate judgment is, that upon the point as to the acceptance, the cause is also in favor of the plaintiffs.

The subject, at least as to myself, is exhausted, and must be left for the further consideration of wiser and abler minds. I deliver my judgment, not without anxiety and diffidence, but it is, that the plaintiffs upon the merits ought to have a decree for remuneration, as for a total loss.